```
              UNITED STATES BANKRUPTCY COURT
              SOUTHERN DISTRICT OF NEW YORK
------------------------------:
                              :  CHAPTER 13
VERONICA C. HOSKING           :  Case No: 14-35174
                              :
                              :  One Bowling Green,
                              :  New York, New York 10004
                              :
                              :  February 25, 2015
                              :  Time: 9:00 am
                              :
                              :
                              :
                              :
------------------------------:
```

### TRANSCRIPT OF EVIDENTIARY HEARING
### BEFORE THE HONORABLE CECELIA G. MORRIS
### UNITED STATES BANKRUPTCY JUDGE

APPEARANCES

STACEY PAIGE BYFORD
Law Office of Stacey P. Byford, PLLC
158 Vineyard Avenue
Highland, NY  12528
BY:  VERONICA C. HOSKING


STUART L. KOSSAR
Knuckles, Komosinski & Elliott, LLP
565 Taxter Road Suite 590
Elmsford, NY  10523
BY:  U.S. BANK NATIONAL ASSOCIATION
RMAC TRUST, SERIES 13-00001T

Transcriber, Jennifer Harper-Gonzalez
Schmieder & Meister, Inc.
82 Washington Street, Suite 209
Poughkeepsie, New York 12601
(845) 452-1988

<u>I N D E X</u>

<u>02/27/2015</u>

                                           PAGE


Model Chapter 13 Plan & Application for Loss

Mitigation pursuant to General Order M455. Extension

Of the commitment period of the Chapter 13 plan from

36 months to 60 months requested filed by Stacey Paige

Byford on behalf of Veronica C. Hosking.

HOSKING VS. U.S. BANK NATIONAL ASSOCIATION

1          (On record at 9:04:06)

2          JUDGE MORRIS:  Good morning.  You may be seated.

3          STACEY BYFORD:  Good morning, Your Honor.

4          STUART KOSSAR:  Good morning, Your Honor.

5          JUDGE MORRIS:  This is Case Number 14-35174 in the

6    matter of Veronica Hoskings.

7          STACEY BYFORD:  Hosking, Your Honor.

8          JUDGE MORRIS:  Hosking.  Thank you.  Yes, you

9    missed yesterday.

10          STUART KOSSAR:  I did.

11          JUDGE MORRIS:  State your name and your

12    affiliation.

13          STACEY BYFORD:  Stacey Byford, Your Honor, on

14    behalf of Ms. Hosking.

15          STUART L. KOSSAR:  Stuart Kossar, Knuckles,

16    Komosinski & Elliott on behalf of the secure creditor, U.S.

17    Bank National Association not in its individual capacity, but

18    solely as trustee for the RMAC Trust Series, 2013-0001T.  Good

19    morning.

20          JUDGE MORRIS:  Very good and have you a witness for

21    me?

22          STUART L. KOSSAR:  Yes, Judge.  Mr. Bill Bell.

23          JUDGE MORRIS:  I'm going to let him take the witness

24    stand.  If you'll come up.  Y'all can be seated because I'm

25    going to ask him some questions first.

1          (The witness is sworn)

2                JUDGE MORRIS:  You may be seated.  State your full

3     name.

4                THE WITNESS:  William Steven Bell.

5                JUDGE MORRIS:  And Mr. Bell, where do you -- what's

6     your address?

7                THE WITNESS:  It's 4509 Brenda Drive, Flower Mound,

8     Texas.

9                JUDGE MORRIS:  And where's Flower Mound?

10               THE WITNESS:  It's north of Dallas.

11               JUDGE MORRIS:  And is that your home address or your

12    office address?

13               THE WITNESS:  That is my home address.

14               JUDGE MORRIS:  Okay.  And where is your office?

15               THE WITNESS:  It is in Dallas.

16               JUDGE MORRIS:  Where in Dallas?

17               THE WITNESS:  1755 Whittington Place, Dallas,

18    Texas.

19               JUDGE MORRIS:  Okay.  I have some questions to ask

20    and then I'll let you the lawyers ask whatever they want to.

21               THE WITNESS:  Okay.

22               JUDGE MORRIS:  What is Roosevelt Management

23    Company, LLC?

24               THE WITNESS:  It is an investment firm that

25    purchases mortgages.

1    JUDGE MORRIS:  And what is Rushmore Loan Management
2    Services?
3    THE WITNESS:  It is a mortgage servicer that
4    services loan for -- for Roosevelt.
5    JUDGE MORRIS:  And are they -- is that the only
6    servicer that Roosevelt has?
7    THE WITNESS:  It is not.
8    JUDGE MORRIS:  What is your relationship to the RMAC
9    Trust Series, 2013-IT?
10    THE WITNESS:  I am the administrator of that trust.
11    JUDGE MORRIS:  And we were shown -- would you please
12    put those investment guidelines up on the --
13    STUART KOSSAR:  Certainly, Judge.
14    JUDGE MORRIS:  -- in a way that you read it, as you
15    read it, right.
16    THE WITNESS:  There we go.
17    JUDGE MORRIS:  Do you see that?
18    THE WITNESS:  Yes, ma'am.
19    JUDGE MORRIS:  How did these guidelines come about?
20    THE WITNESS:  They were written about five years
21    ago.  Actually, I -- I wrote them.
22    JUDGE MORRIS:  That was going to be my next
23    question.  Did you write them?
24    THE WITNESS:  Yes, ma'am.
25    JUDGE MORRIS:  And you wrote them five years ago?

1          THE WITNESS:  Uh-huh.

2          JUDGE MORRIS: Do you have a pooling [phonetic] and

3      service agreement with RMAC Trust, Series 2013-IT?

4          THE WITNESS:  It's not a pooling and servicing

5      agreement.  We have a servicing agreement with Rushmore and

6      these are the guidelines that we utilize for our loan

7      modification program with Rushmore.

8          JUDGE MORRIS:  Is RA -- RMAC Trust Series 2013-IT

9      registered with the SCC?

10         THE WITNESS:  It is - It is a private trust.  So it

11     is not.

12         JUDGE MORRIS:  Are there any other documents aside

13     from the purported guidelines that relate to the RMAC Trust

14     Series 2013-IT?

15         THE WITNESS:  I don't completely understand that

16     question.

17         JUDGE MORRIS:  Are there any other documents

18     concerning this RMAC Trust, do you have anything at all -- do

19     you stuff you do with the SCC?  You said, "It's private."  You

20     don't have anything else?  What is the background on your on

21     your trust.

22         THE WITNESS:  It is --

23         JUDGE MORRIS:  You have no other documents

24     considering this trust?

25         THE WITNESS:  It's -- It's a private trust that was

1    created to hold specifically mortgage loans.

2              JUDGE MORRIS:  Where is those documents that talk

3    about creating that, that holds mortgage loans?

4              THE WITNESS:  We -- We have those.

5              JUDGE MORRIS:  Okay.

6              THE WITNESS:  They -- They don't have any reference

7    to loan modifications in those documents.  If that's what

8    you're looking for.

9              JUDGE MORRIS:  I -- Okay.  I just simply asked if

10   they exist.

11             THE WITNESS:  Yes, ma'am.

12             JUDGE MORRIS:  And what do -- and they do exist?

13   But this is solely "a private trust"?

14             THE WITNESS:  Yes.

15             JUDGE MORRIS:  How did you get this loan?  Where did

16   you buy it from?

17             VERONICA HOSKING:  It was --

18             JUDGE MORRIS:  No -- No, ma'am.

19             VERONICA HOSKING:  I'm sorry.

20             JUDGE MORRIS:  Where did you buy Ms. Hosking's loan

21   from?

22             THE WITNESS:  We -- We acquired this loan in

23   December of 2013 from an organization by the name of Arch Bay

24   [phonetic].

25             JUDGE MORRIS:  So what other documents aside from

1    this purported investor guidelines that relate to the RMAC

2    Trust Series 2013-IT exist, all documents?  Name them.

3             THE WITNESS:  There -- There would be a purchase

4    agreement between us and Arch Bay.

5             JUDGE MORRIS:  No -- No -- No, not just her.  All

6    documents, do you have incorporating documents?  Do you have

7    FDIC documents?  Do you have -- Do you report to any other

8    agency whatsoever besides just what you're doing?

9             THE WITNESS: I -- I actually can't answer that

10   question.  That's not my area of expertise.  I -- I don't know

11   that.

12            JUDGE MORRIS:  So what's your position with this?

13   You're the manager of this thing.

14            THE WITNESS:  I'm the -- I'm the Vice President over

15   the Asset Management Group.  So my department's responsible

16   for reviewing and approving loan modifications, short sales,

17   REO sales, things like that.

18            JUDGE MORRIS:  How many mortgages are in the RMAC

19   Trust Series 2013-IT?

20            STUART KOSSAR:  Objection.

21            JUDGE MORRIS:  Why?

22            STUART L. KOSSAR:  Relevancy.

23            JUDGE MORRIS:  It's totally relevance to me.

24            STUART KOSSAR:  The scope is --

25            JUDGE MORRIS:  Overruled.  Take me up.  How many?

1       THE WITNESS:  I would have to confirm because

2   obviously that's a change in population as -- as loans paid

3   off and -- and -- and sell and things like that but I would

4   guess it would be 250 somewhere in that ballpark.  But I --

5   I don't know the exact number.

6       JUDGE MORRIS:  What do you do to maintain this

7   trust?

8       THE WITNESS:  The -- The trust is -- maintained -

9   - it was created to hold those mortgage loans.  U.S. Bank is

10  our trustee.  So all funds are remitted through -- through

11  them.  And then we receive those remittances.

12      JUDGE MORRIS:  So you as administrator you've also

13  just testified that you're not really the administrator.

14  You're just the short sale.  You're the --

15      THE WITNESS:  I -- The trustee handles the funds in

16  the bank accounts.  And my group makes all the economic

17  decisions.

18      JUDGE MORRIS:  So you really aren't the

19  administrator of the trust, that is somebody else?

20      THE WITNESS:  No, I am the administrator of the

21  trust.  U.S. Bank is the trustee who holds those funds and we

22  control and make all the economic decisions on it.

23      JUDGE MORRIS:  Why isn't the trustee here?

24      STUART KOSSAR:  Judge, there's been no request for

25  the trustee to appear.  This hearing is limited to the scope

1    of my client and how [indiscernible] and how those guidelines

2    apply to this loan.

3              JUDGE MORRIS:  Okay.  Let's look at these then.

4    We'll go through that and then we'll get to the other because

5    I'm still really unhappy.  Where in these guidelines does it

6    say it applies to this trust?

7              THE WITNESS:  If you see at the top, it's references

8    Investor #273 that is the Investor code that is utilized

9    for this trust.  At the top there, the second line --

10             JUDGE MORRIS:  But no outsider would know this,

11   just insider?

12             THE WITNESS:  Yeah, this is a -- this is a matrix

13   that's used for -- for reviewing loan modifications.

14             JUDGE MORRIS:  Why is there not a date on this?

15             THE WITNESS:  I can't answer that, ma'am.

16             JUDGE MORRIS:  Direct.

17             STUART KOSSAR:  Thank you, Judge.

18                    DIRECT EXAMINATION

19   BY MR. KOSSAR:

20        Q    Mr. Bell, Judge Morris already asked you questions.

21   I'm going to ask you some questions of my own.  And I'm going

22   to not to overlap the testimony that you previously provided.

23   But I just want to provide a little bit information relating

24   to your background.

25             JUDGE MORRIS:  Okay.  Let me ask one other question

1    before we go.  Where is any document that relates to 273?

2              THE WITNESS:  What -- What sort of document, ma'am?

3              JUDGE MORRIS:  You say this is it.  But somewhere

4    273's got to be identified.

5              THE WITNESS:  It's -- It's identified in -- in

6    Rushmore's servicing system.  There's a code in there.  You

7    can see it.

8              JUDGE MORRIS:  So this is just simply a code thing

9    here.  This is not your written documents?

10             THE WITNESS:  No, these are the written documents

11   that Rushmore's underwriting department would use to -- to

12   review this loan.

13             JUDGE MORRIS:  Is that signed?  What you did

14   with 273, is that signed with Rushmore?

15             THE WITNESS:   Is that assigned with Rushmore?

16             JUDGE MORRIS:  Signed?

17             THE WITNESS:  It's -- It's --

18             JUDGE MORRIS:  Rushmore agrees, you agree, sign

19   document.

20             THE WITNESS:  Yeah, they're -- as -- as I --

21             JUDGE MORRIS:  Why wasn't that produced?  Where

22   does it come from?  Where does this information come from?

23   Did you make this up?

24             THE WITNESS:  No, ma'am.  I did not.  As I said,

25   it's been in plan for quite a few years.

1    JUDGE MORRIS:  Besides, but it had to come from

2    somewhere.  This is so skeletal.  It had to come from

3    somewhere.

4    THE WITNESS:  This has been redacted down to just

5    specific loan.  If you looked at the actual schedule it's quite

6    long with lots of other [indiscernible].

7    JUDGE MORRIS:  Okay.  Why don't we have it?  That

8    -- we asked for that.  Where is it?

9    STUART KOSSAR:  That is it.  That's what been

10   provided.

11   JUDGE MORRIS:  No, where is it?  The whole loan

12   document that refers to this.  Where is it?

13   STUART KOSSAR:  I don't have the entire loan

14   document.

15   JUDGE MORRIS:  We asked for it.  I told you to get

16   it.

17   STUART KOSSAR:  That's -- My understanding is

18   that's the guideline.

19   JUDGE MORRIS:  You have nothing that's in sentences

20   and paragraphs and --

21   THE WITNESS:  No, ma'am because there's -- there's

22   multiple investor codes.  So this is the matrix that they -

23   - we utilize for reviewing loan modifications.

24   JUDGE MORRIS:  Ask your questions.  So it's all in

25   your head.

1          THE WITNESS:  No.

2          JUDGE MORRIS:  So if you're the one decides --

3          THE WITNESS:  No, ma'am.  It's not.  This is the

4    guidelines that we utilize.

5          STUART KOSSAR:  Judge, may I proceed?

6          JUDGE MORRIS:  Yeah.

7          STUART KOSSAR:  Thank you.

8       BY MR. KOSSAR:

9          Q    Mr. Bell, how long have you worked at Roosevelt Mag--

10   Roosevelt for?

11   A    For seven years.

12         Q    And what are some of your responsibilities there?

13   A    My responsibilities are to review and make decisions,

14   economic decisions on all assets that we own.

15         Q    And how long have been involved in evaluating

16   mortgage loan modifications?

17   A    I have worked in the mortgage servicing business for 15

18   years.

19         Q    And you have final authority determining whether or

20   not a mortgage can be modified?

21   A    I do.

22         Q    Is there anything above to overrule you?

23   A    No.

24         Q    And I'm going to refer you again to these written

25   guidelines.

1           STUART KOSSAR:  Your Honor, can these be marked as

2      an Exhibit?

3           JUDGE MORRIS:  Sure.

4           STUART KOSSAR:  I request that this be marked as

5      Exhibit A?

6           JUDGE MORRIS:  Any objection?

7           STACEY BYFORD:  No objection, Your Honor.

8             [Written guidelines marked as Exhibit A]

9      Q    What are the purpose of these guidelines, Mr. Bell?

10     A    To help have uniform reviewing and decisioning [phonetic]

11     of loan modifications.

12     Q    Are there any Federal rules applicable to these

13     guidelines?

14     A    No, this is a -- this is a private trust with private

15     rules.

16     Q    And I call your attention to the first line of the

17     Exhibit A.  Can you read that for me, please?

18     A    Yes, it says Asset Manager.

19     Q    Can you read the entire line?

20     A    Yeah, Asset Manager, RMC.

21          JUDGE MORRIS:  So you're testifying already that

22     you're the one that can overrule anything that says a 25% down

23     payment?

24          THE WITNESS:  I do have final authority to make

25     decisions on loan modifications, yes ma'am.

1        JUDGE MORRIS:  You just testified to that.

2        THE WITNESS:  Mmm-hmm.

3    Q    Would you read the entire second line, please?

4    A    Investor #273.

5    Q    What is that?

6        JUDGE MORRIS:  I think that he just testified that

7    these guidelines don't matter.  He has the ability to overrule

8    everything.

9        STUART KOSSAR:  Well, then he's just saying that

10   has the final authority.  He didn't testify --

11       JUDGE MORRIS:  Yes, he did.  I asked him and he said

12   that.

13       STUART KOSSAR:  -- he testified he has the final

14   authority.  He hasn't testified that he has the ability if he

15   chooses to go outside the scope of what he wants to do.  He's

16   prepared today to testify out of these guidelines that he

17   follows applies to these -- to this particular loan.

18       JUDGE MORRIS:  He just said, "Nobody's stops him."

19   He can do what he wants to.

20       STUART KOSSAR:  But he still has rules and

21   procedures.

22       THE WITNESS:  I do.

23       JUDGE MORRIS:  From whom?  Himself, he wrote them.

24   He just testified that he could overrule them.

25   Q    Mr. Bell, could you please read the entire sixth

1    line?

2    A    One, two, three, four, five, six.  Minimum LTB.

3         Q    What does that mean?

4    A    That is the minimum loan to value ratio that we attempt

5    to get at when we're doing loan modifications.

6         Q    And Mr. Bell could you read the seventh line on

7    Exhibit A?

8    A    Max front end DTI.

9         Q    And what does that mean?

10   A    35%.  That means that we attempt to on all loan

11   modifications have the borrower have a 35% front end DTI based

12   on their income -- debt to income ratio.

13        Q    Alright.  Mr. Bell, could you please read the next

14   line on Exhibit A?

15   A    Maximum back end DTI 45% which means the maximum back end

16   DTI including all items reported on a credit bureau i.e. credit

17   card bills, car payments.  That is the ratio we're targeting

18   to get to.

19        Q    Alright.  Mr. Bell, I call your attention to the

20   line that begins with target down payment.  Do you see what

21   I'm referring to?

22   A    Yes.

23        Q    Would you please read that line for me?

24   A    Target down payment 25%.

25        Q    How does that work?

1     A     We will target that the customer will provide 25% of the

2     arrears as a good faith down payment on a trial loan

3     modification.

4     Q     Now, what is the purpose of providing that down

5     payment requirement?

6     A     It assists in the borrower to be committed to -- to

7     re-perform on their loan.  We see from -- from experience that

8     borrowers that put down a down payment perform better or --

9     or usually 30 to 40% better over the life of -- of the loan.

10             JUDGE MORRIS:  Where is that?

11             THE WITNESS:   Those -- Those are internal

12     statistics, ma'am.

13             JUDGE MORRIS:  Can you produce those?

14             THE WITNESS:   We haven't been asked to.

15             STUART KOSSAR:  Judge, he's testified based on his

16     personal knowledge.

17             THE WITNESS:  Yeah.

18             JUDGE MORRIS:  So it's in his head.  We don't have

19     that.  He said it was internal.  It's in his head.  Where is

20     that?

21             STUART KOSSAR:  Well, he's testified based on his

22     experience.

23             JUDGE MORRIS:  How about an objection then?  He

24     said, it was in his -- it was -- he said it was internal

1    document.  You can't testify to something that you can't

2    produce.  Is it written down?  Do we have it anywhere?

3              STUART KOSSAR:  No, he's testified that his

4    experience in the industry as well [indiscernible] these

5    mortgage loan modifications.  He can testify based on his

6    experience what he has seen in the past.

7              JUDGE MORRIS:  You're not objecting.  But we know

8    how these guidelines came about in his head.  Now, we hear this

9    is in his head.  I'm not overruling because nobody objecting.

10   But I'm asking the question.  Okay.  Go ahead.

11        Q    Mr. Bell, I call your attention to the line titled

12   Amortization, do you see where I'm referring to?

13   A    Uh-huh.

14        Q    Would you please read that line, please?

15   A    Amortization fixed.

16        Q    What does that mean?

17   A    That means that we will fix when we do a loan modification,

18   we fix the interest rate for the life of the loan.

19        Q    And I call your attention to the next line starting

20   with minimum rate.

21   A    Minimum rate 5 to 7%.

22        Q    Okay.  And how does that work?

23   A    We will when we're reviewing the loan modification put

24   the interest rate between 5 to 7% over the life of the loan.

25        Q    And I call your attention to the line below that.

1   max term, do you see where I'm referring to?

2   A    Yes.

3        Q    Can you please read that line, please?

4   A    Max term 480, for 480 months or 40 years.

5        Q    And how does that work?

6   A    We will extend the term of the loan for -- for 40 -- up

7   to 40 years to try to get to that front end DTI ratio.

8        Q    And Mr. Bell, I call your attention to the line

9   titled "Hardest hit programs."  Can you please read that line,

10  please?

11  A    Yeah, hardest hit programs reinstatement, yes,

12  unemployment, no not as a source of income for mod which

13  basically means that we -- we don't accept unemployment income

14  as income for our calculations for a loan modification.

15       Q    And are these the policies that are followed when

16  loans are evaluated for mortgage modifications?

17  A    Correct.  So these guidelines are -- are -- are utilized

18  at our service at Rushmore whose loan modification

19  underwriting department will -- will review based on these

20  guidelines.

21            JUDGE MORRIS:  Where are you getting what this

22  means?  It doesn't say that.  Where are you getting that?

23  Where is this information you're testifying to coming from?

24            THE WITNESS:  This --

25            JUDGE MORRIS:  From your head?

1          THE WITNESS:  This is -- This is matrix that we

2     utilize, ma'am.

3          JUDGE MORRIS:  There's nothing on there that says

4     what he says.  So is he just making this up?  I'm sorry.  I

5     am really frustrated.

6          STUART KOSSAR:  Judge, these are the guidelines.

7          JUDGE MORRIS:  There is no guideline here.  Do you

8     not understand that there is no guideline here?  These are

9     simply words and he's testifying to a lot of stuff that has

10    no background.  He is simply bringing it out of his head.

11    Where is this coming from?  Did he make this up himself?  Did

12    he have written guide -- written things for people to talk

13    about?  Where is this coming from?  Look at this yourself.

14    Can you read this without him testifying to it?

15         STUART KOSSAR:   I know what the acronyms mean and

16    I understand that.  If someone that has experience in

17    modifications --

18         JUDGE MORRIS:  Okay.  I'm going to stop right now

19    and he's going to produce all the documentation for this entire

20    trust including that and then we will let you review it and

21    you can ask questions.

22         MR. BYFORD:  No, cross-examination today?

23         JUDGE MORRIS:  Well, yeah, I'll let you cross-

24    examine because we might save him a trip and you finish your

25    direct.

1    STUART KOSSAR: Well, Judge if that's --

2    JUDGE MORRIS: I can't make a decision based on a

3    simple little thing that is now coming from this man's head.

4    How in the world do you think individual owners of homes that

5    are trying to do a mortgage that are looking at this could do

6    the same thing. In other words, he has already said that he

7    can [indiscernible] make a decision on a loan because it's all

8    up to him. You can ask as many questions as you want but there

9    is nothing behind this. And I know I stopped it in the middle

10   but I have to tell you this testimony is so frustrating.

11   STUART KOSSAR: Judge, may I --

12   JUDGE MORRIS: Yeah, you can go ahead.

13   STUART KOSSAR: -- Judge if the Court --

14   JUDGE MORRIS: I'll take a break because I am

15   so frustrated. So --

16   STUART KOSSAR: Judge, my client is certainly happy

17   and I'll speak with him about what documents he has

18   particularly pertaining to the trust in addition to what's

19   required under this particular loan. It may be better for the

20   Court's purpose --

21   JUDGE MORRIS: They were already ordered. I

22   ordered those to be given.

23   STUART KOSSAR: But this is the guidelines for the

24   loan.

25   JUDGE MORRIS: No, it isn't. And if you can't see

1    that, that's where I'm so frustrated.  This is a simple little

2    matrix that has acronyms that had something that went into it

3    and there is no background and that was not produced.  I asked

4    that it be produced.

5         Now, he is testifying from guidelines in his head.  There

6    is no background on that.  There's nothing.  It's simply up

7    here.  He is explaining what the guidelines are but I have no

8    written things that go into it.  He's already testified and

9    I'm inserting in myself too much.  He's already testified to

10   -- that Roosevelt or whoever these were have the background

11   information that goes to him.  He's not the trustee.

12        He's the administrator of this part of the thing.  I

13   ordered the trustee in here.  And he says they don't do HAMP

14   [phonetic].  But HAMP doesn't require 25%.  I -- okay.  I'm

15   trying to not be frustrating to you or your witness.  I'm

16   really trying hard.  But I have to tell you at this moment,

17   I am absolutely appalled.  Mr. Bell, have you ever met Ms.

18   Hosking?.

19             THE WITNESS:  I -- I did this Hosking.

20             JUDGE MORRIS:  Have you ever met anyone like Ms.

21   Hosking?

22             THE WITNESS:  I -- I -- my organization works with

23   lots of customers every day.

24             JUDGE MORRIS:  But you don't get to meet them.

25             THE WITNESS:  I -- I do come to Court quite a bit

1     actually.

2              JUDGE MORRIS:  Oh, interesting that you come to

3     Court quite a bit.

4              THE WITNESS:  Uh-huh.

5              JUDGE MORRIS:  So you do get to meet them.  Okay.

6              THE WITNESS:  And actually, we do outreach events

7     and talk to borrowers in their homes and do lots of thing,

8     ma'am.

9              JUDGE MORRIS:  That even makes me a little more

10    appalled because you're also asking them for 25% down payment.

11    Go ahead.

12             STUART KOSSAR:  Judge, may I make a suggestion?  If

13    the Court wants to review additional documents, perhaps, it

14    is better to look at this globally.  If the Court wants

15    additional documents that do not pertain to this particular

16    loan, maybe should proceed at a later --

17             JUDGE MORRIS:  It should had been here today.

18             STUART KOSSAR:  Okay.  Alright.  I'll proceed.

19             JUDGE MORRIS:  It's not here.

20        Q    Alright.  Mr. Bell, are you familiar with the debt

21    of Veronica Hosking?

22    A    I -- I have reviewed her file, yes.

23        Q    How are you familiar with her?

24    A    I reviewed the -- the loan modification request that was

25    denied earlier.

1      JUDGE MORRIS:  Who denied it earlier?

2      THE WITNESS:  It was -- was denied a couple months

3      ago.

4      JUDGE MORRIS:  Who?

5      THE WITNESS:  It came through our process.  It was

6      reviewed by Rushmore.  It was reviewed by an employee that

7      works for me and then -- and then it was reviewed by me, ma'am.

8      JUDGE MORRIS:  How about the name of the employee

9      that denied it?

10      THE WITNESS:  I denied it.

11      JUDGE MORRIS:  You said you reviewed after it was

12      denied.  Who denied it initially?

13      THE WITNESS:  I'm the only one that can actually

14      deny.  So I actually denied it.

15      JUDGE MORRIS:  And then you reviewed your own

16      denial?

17      THE WITNESS:  No, I reviewed and denied it.

18      STUART KOSSAR:  You Honor, I would like to have this

19      marked for identification as Exhibit B.  It's a proof of claim

20      file for the Court.

21      STACEY BYFORD:  No objection.

22      JUDGE MORRIS:  I have to take judicial notice

23      anywhere.

24      STUART KOSSAR:  Okay.

25      JUDGE MORRIS:  So judicially noted.

1   [Proof of claim marked for identification as Exhibit B]

2       Q    Mr. Bell, I call your attention to Exhibit B, do you

3   recognize it?

4   A    It's a proof of claim.

5       Q    And I call your attention to Exhibit B, Page 1.  Can

6   you please advise what debtor's arrears were at the time she

7   filed for bankruptcy in June 2014?

8   A    Yeah, $18,112.26, 25 or 26.

9       Q    Thank you.  Your Honor, I respectfully request that

10  this be pre-marked as Exhibit C for identification?  It is the

11  initial documentation that debtor's counsel have provided to

12  us in connection for her application for a mortgage

13  modification.

14          JUDGE MORRIS:  Any objection?

15          STACEY BYFORD:  No objection, Your Honor.

16          JUDGE MORRIS:  Submitted.  Admitted.

17  [Customer application per-marked for identification as Exhibit C]

18      Q    Mr. Bell, I call your attention to Exhibit C, do you

19  recognize it.

20  A    It's -- It's the application from -- from the customer

21  for a loan modification.

22      Q    What did your review reveal?

23  A     We reviewed her -- her income sources, her hardship

24  letter, and we reviewed it based on -- on our guidelines.

1    Q    What did you do after you completed this initial

2    review?

3    A    We requested additional documentation from the customer.

4    Q    How did you do that?

5    A    Via letter.

6    STUART KOSSAR:  Your Honor, I'd like to have this

7    Exhibit marked as identification as Exhibit D which is both

8    an email to debtor's counsel showing that the August 11th letter

9    from my client which transmitted to --

10    JUDGE MORRIS:  Have you had a chance to look at this

11    Ms. Byford?

12    STACEY BYFORD:  I haven't.  I have no objection,

13    Your Honor.

14    JUDGE MORRIS:  Submitted -- admitted.

15    STUART KOSSAR:  Admitted as Exhibit D.

16    [August 11th letter marked as identification as Exhibit D]

17    Q    Mr. Bell, I call your attention Pages 2 - 5 of Exhibit

18    D.  I'm going to slowly -- I'd like you to take a look at it

19    as you review each page.  Let me know after you've reviewed

20    it and then I'll turn to the next page so that everyone can

21    see.

22    A    Yeah, this is -- this is a letter that is sent out to

23    request additional documents from the customer.  And also in

24    the first paragraph helps explain what a loan modification is

25    in our standard requirements.

1    Q    I call your attention on Page 2 of Exhibit D, the

2    first paragraph, could you please read the last two sentences

3    of that second -- of that paragraph, please?

4    A    If you successfully complete the trial payment plan there

5    -- and there is no material change in your financial

6    circumstances then you maintain the eligibility of permanent

7    loan modification is offered.  Most of our -- Most of our loan

8    owners require that you make a good faith down payment in

9    connection with the trial payment plan.  The good faith

10   payment which is generally a percentage of the past due debt

11   is applied to -- to reduce your outstanding debt and usually

12   reduces the amount of the monthly payment under the

13   modification.

14   Q    Thank you, Mr. Bell.  Now, --

15        JUDGE MORRIS:  Who signed this letter?

16        STUART KOSSAR:  I was going to get to that but it

17   was signed by the Home Retention Department [phonetic].

18        JUDGE MORRIS:  There's not an individual that

19   signed it?

20        STUART KOSSAR:  No.

21   Q    Mr. Bell, I call your attention to Page --

22        JUDGE MORRIS:  Excuse me, did this go as an

23   attachment to an email?

24        STUART KOSSAR:  Yes.

25        JUDGE MORRIS:  Who sent the email?

1   STUART KOSSAR:   Our office did.

2   JUDGE MORRIS:   Your office did?

3   STUART KOSSAR:   Yes, I would note that on Page 1 of

4   Exhibit D that we transmit same on August 13, 2014.

5   JUDGE MORRIS:   Okay.

6   Q   Mr. Bell, I call your attention --

7   JUDGE MORRIS:   How can he testify to a letter that

8   he didn't write?

9   STUART KOSSAR:   He can testify based on the business

10   records as well as review of the file.  He's reviewed all the

11   file and all the documentations relating to this matter.

12   STACEY BYFORD:   Your Honor, I have no objection to

13   him -- he's simply all he's doing at this point is reading the

14   document.  But if it goes anything beyond reading the document

15   as you know, interpreting the document or what the document

16   means than I would have a valid objection.

17   JUDGE MORRIS:   Okay.

18   Q   Mr. Bell, I call your attention to Page 3 of Exhibit

19   D.  What was required to complete the loan modification under

20   this loan?

21   A   Three months' pay stubs, three months bank statements.

22   And then three months of bank statements to show that those

23   Social Security deposits.

24   Q   Is there anything related to a down payment in --

1    A    Yeah, it -- it -- it also requests proof of funds for a

2    down payment.

3         Q    Mr. Bell, did you receive any additional documents

4    in reviewing this modification application?

5    A    Yeah, the borrower -- the customer submitted additional

6    documents after -- after the letter was sent.

7              STUART KOSSAR:  Your Honor, I would like to have an

8    Exhibit marked for identification, Exhibit E which I would like

9    to show the counsel to make sure she's [indiscernible].  These

10   are the additional documents that you've provided to us.

11             JUDGE MORRIS:  Make sure there's no Social Security

12   numbers on it.  Okay.

13             STUART KOSSAR:  Also redacted the account

14   information as well.

15             STACEY BYFORD:  Your Honor, I have seen these

16   documents before and I have no objection to most of them.  He

17   did redact most of them at my request but I see that he did

18   not redact the account numbers.

19  [Additional documents for loan modification received into evidence

20  as Exhibit E]

21             JUDGE MORRIS:  Do we have a black magic marker

22   anywhere?

23             STUART KOSSAR:  Where is it?

24             STACEY BYFORD:  On every page.

1          JUDGE MORRIS:  I tell you what.  I'm going to hand

2     you a black magic marker.  We'll take a break while y'all do

3     that.

4          COURT CLERK:  All rise.

5                         (Recess)

6          JUDGE MORRIS:  Mr. Kossar, it's with you.

7          STUART KOSSAR:  Thank you, Judge.

8     Q    Mr. Bell, I call your attention to Exhibit E which

9     has been marked for identification.

10         STUART KOSSAR:  And I request that same be submitted

11    into evidence, which there has been no objection stated by

12    Counsel.

13         STACEY BYFORD:  No objection, Your Honor.

14         JUDGE MORRIS:  Very good.  We've -- it's in

15    evidence.

16         STUART KOSSAR:  Thank you, Judge.

17    Q    Mr. Bell, I call your attention to Exhibit E.  Did

18    you receive this application -- this material in connection

19    with the debtor's modification application?

20    A    Yes, this is her -- her paystub.

21    Q    Okay.  In addition, to these documents that were

22    provided by debtor, do you find any other information related

23    to this loan?

24    A    We've -- We've reviewed her hardship letter, her

25    paystubs, her bank statements.

1      Q     Are you familiar with her prior history relating to

2   this loan?

3   A     We -- We did determine that she did have two prior loan

4   modifications?

5              JUDGE MORRIS:  Who's we?

6              STACEY BYFORD:  Objection, Your Honor.  It's not

7   relevant.

8              JUDGE MORRIS:  You think it's not relevant.  I

9   don't who we is.  I will sustain your objection as to

10   relevance.

11              STUART KOSSAR:  Your Honor, my client is attempting

12   to advise how he evaluated the modification application.  He's

13   required -- he needs to be able to testify about his ability

14   and what he reviewed so the Court can evaluate the scope of

15   his determination what he reviewed when evaluating this

16   application.

17              STACEY BYFORD:  Your Honor, I think the only issue

18   for today's hearing is whether or not the denial that was based

19   on an inability to make a down payment was in good faith or

20   bad faith.  I don't think Ms. Hosking's modifications in 2006

21   and 2011 have any barren on this whatsoever.

22              JUDGE MORRIS: I agree.

23              STACEY BYFORD:  And I object.

24              JUDGE MORRIS:  Sustained.

1    Q    Mr. Bell, what did your examination of debtor's loan

2    history reveal?

3              STACEY BYFORD:  Objection, same reason.

4              STUART KOSSAR:  He already testified what he knew.

5              JUDGE MORRIS:  Repeat your question.

6              STUART KOSSAR:  He can testify about what he knows

7    about the loan history and what he reviewed in making his --

8    --

9              JUDGE MORRIS:  It's the same thing.  It's not

10   relevant.

11             STACEY BYFORD:  Thank you.

12             JUDGE MORRIS:  Sustained.

13   Q    What happened after you reviewed all the information

14   in connection with debtor's modification application?

15   A    It -- It was determined that we were requesting a good

16   faith down payment from the customer and that the amount --

17             JUDGE MORRIS:  Who's we?

18             THE WITNESS:  Rushmore and I as the investor.

19             JUDGE MORRIS:  And who at Rushmore?

20             THE WITNESS:  They have an entire underwriting

21   department that review files, ma'am.?

22             JUDGE MORRIS:  Names of those people?

23             STUART KOSSAR:  Objection.

24             JUDGE MORRIS:  Names of those people.  It's the

25   Court that's asking.  You don't get to object to my question.

1        THE WITNESS:  I would have to look at the rooster

2   and go through the names.  There's multiple employees.

3        JUDGE MORRIS:  Can you do that?

4        THE WITNESS:  I don't have that information with me

5   today.

6        JUDGE MORRIS:  Why did you not bring it today?

7        THE WITNESS:  I -- I don't have that information,

8   ma'am.

9        Q    Mr. Bell, I call your attention to what I pre-marked

10   for identification Exhibit F, which I would like to show it

11   to the opposing counsel which is simply some correspondence

12   between the parties and some prior letters.

13        STACEY BYFORD:  Your Honor, I'll have no objection

14   to these documents once the loan number is redacted from each

15   page.

16        JUDGE MORRIS:  Do you have another magic marker?

17        STUART KOSSAR:  Yes, I'll do that.

18        JUDGE MORRIS:  Well, you need to look together.  So

19   make sure it's done together.

20        STACEY BYFORD:  No objection, Your Honor.

21        JUDGE MORRIS:  Very good.

22   [September 9, 2014, letter marked into evidence at Exhibit F]

23        STUART KOSSAR:  Thank you.

24        Q    Mr. Bell, I'm now showing you what's been marked into

25   evidence as Exhibit F.  And I call your attention to Page 4

1    of Exhibit F.  It's a letter dated September 9, 2014.  Do you

2    recognize it?

3    A    Yeah, this is additional documentation letter.

4        Q    What is it?

5    A    It's similar to a letter that we reviewed earlier.

6        JUDGE MORRIS:  Yeah, I was going to say.  It looks

7    like exactly the same letter.  Would you put the same letter

8    up beside side it, the first letter up beside side it.

9        STUART KOSSAR:  My apologize, Judge.  It's the same

10   letter.  What I wanted to just point out is that the -- of

11   course, the Court didn't know that the fact these letters as

12   well as the down payment wires were transmitted to Counsel by

13   email.

14       JUDGE MORRIS:  Okay.  I think that we were aware of

15   that long time ago.

16       STUART KOSSAR:  Okay.

17       JUDGE MORRIS:  I think we were aware of that.  And

18   you repeatedly sent the same letter?

19       STUART KOSSAR:  No, it's the same letter as before.

20   There's an August 11th letter and there's a September 9th letter.

21       JUDGE MORRIS:  And they're the same letter?

22       STUART KOSSAR:  They're slightly different.

23       STACEY BYFORD:  They're not the same letter, Your

24   Honor.

25       JUDGE MORRIS:  Okay.

1    STUART KOSSAR:  I just want to make sure that all

2    the correspondence is reflected.  Judge, and I would point out

3    that the letter --

4    JUDGE MORRIS:  Is this one signed?  Is this letter

5    signed?

6    STUART KOSSAR:  No, it's signed by the Home

7    Retention Department.

8    Q    I would just note that Mr. Bell I call your attention

9    to Page 4.  And I call your attention to the First Paragraph

10   of Page 4, can you please read the last two sentences of that

11   paragraph, please?

12   A    If you're successful --

13   JUDGE MORRIS:  He's already done that.

14   STUART KOSSAR:  Well, it's a different letter,

15   though.

16   JUDGE MORRIS:  That's the same thing.

17   STUART KOSSAR:  That's fine if the Court

18   [indiscernible].

19   JUDGE MORRIS:  Okay.  Read it again.

20   THE WITNESS:  If you successfully complete the

21   trial payment plan and there is no material change in your

22   financially circumstances and you maintain eligible, a

23   permanent loan modification is offered.  Most of our loan

24   owners require that you have a good faith payment in connection

25   with the trial payment plan.  A good faith payment which is

1    generally a percentage of the past due debt is applied to reduce

2    your outstanding debt and usually reduces the amount of monthly

3    payment under the modification.

4            Q     Thank you, Mr. Bell.

5            STUART KOSSAR:    And Your Honor, I call this Court's

6    attention to what I would like to have marked as Exhibit,

7    pre-marked by identification Exhibit G which is the status

8    letter filed with the Court on Exhibit G.

9            JUDGE MORRIS:  I'm sure that it's part of the

10   record.   Is it?

11           STUART KOSSAR:  And it's filed in NCO.

12           JUDGE MORRIS:  Okay.  It is.  Take judicial notice

13   of the fact that it was filed.

14    [Status letter per-marked by identification as Exhibit G]

15           Q     Mr. Bell, I call your attention to Exhibit G, would

16   you please read the Third paragraph of that letter?

17   A     Since the prior loss mitigation status, hearing held on

18   September 9, 2014, our client has informed us that the debtor's

19   last minute application was moved forward with no down payment

20   offer as one as not been provided.   The file is currently under

21   review for a decision.

22           Q     Thank you, Mr. Bell.  Now, tell us how you reviewed

23   all this documentation?

24   A     So the file is reviewed at -- at Rushmore as a servicer.

1    JUDGE MORRIS: Excuse me, just one moment. Would
2    you put that back up on there? I can understand but you're
3    having someone testify to something that someone in your firm
4    wrote, not something that he wrote.
5    STUART KOSSAR: That's fine, Judge. I'm just
6    merely-- I'm just admitting into evidence for the purposes
7     of showing what has been provided.
8    JUDGE MORRIS: Okay. Well, you can put it in as
9    judicial record but I can't take notice of anything in it
10   because he can't testify to anything that's in this letter.
11   STUART KOSSAR: Well, I  can -- Can I testify, read
12   the document based on my review of the file as the attorney?
13   JUDGE MORRIS: Of course not.
14   STUART KOSSAR: Okay.
15   JUDGE MORRIS: You're counsel. If you become a
16   witness, you've got to have another attorney in this room.
17   STUART KOSSAR: Understood.
18   Q    Now, Mr. Bell, what happened, excuse me. Let me
19   back up to my prior question. How was -- How did you review
20   this modification application?
21   A    So Rushmore's loan modification underwriting department
22   will review all the documents including the income. They
23   would do an analysis on that understanding how much income the
24   customer has on a monthly basis. They would then put it
25   through the -- the loan modification matrix that we reviewed

1    earlier and see if they qualify under -- under that.  It would

2    then be submitted the investor which is my group for review.

3    We would review it and make a determination based on that matrix

4    that we reviewed earlier.

5         Q    And in terms of matrix, would you refer --

6              JUDGE MORRIS:  Who at Rushmore -- I'm going to keep

7    asking this every time you refer to a group.  What is the name

8    of the individual that you consulted with at Rushmore?

9              THE WITNESS:  I -- I don't recall off top of my head,

10   ma'am?

11             JUDGE MORRIS:  Did you make notes?

12             THE WITNESS:  Did I make notes where, ma'am?

13             JUDGE MORRIS:  When you're talking to Rushmore

14   about a file, did you make notes somewhere?  Say I talked with

15   John Doe and John said, "Blah."  And is that in some notes

16   somewhere?

17             THE WITNESS:  It's within the servicing system.

18             JUDGE MORRIS:  And you didn't bring that with you

19   today?

20             THE WITNESS:  No, I did not.

21             JUDGE MORRIS:  Okay.

22        Q    What happened after you reviewed the application?

23   A    The determination was made that since the borrower did

24   not have a down payment that we were denying the application

25   based on that fact.

1      Q     And why is it important for the down payment?

2    A    Based on my experience in reviewing files for years, loan

3    modifications perform better when the customer has provided

4    a good faith down payment.

5      Q     Mr. Bell, did you put this into writing?

6    A    Yes.

7          STUART KOSSAR:  Your Honor, I'm now going to show

8    to counsel, I have pre-marked for identification Exhibit G

9    which is the denial letter as well as the email transmission

10   to the Counsel [indiscernible].

11         JUDGE MORRIS:  May I ask you a question, Mr. Kossar?

12         STUART KOSSAR:  Sure.

13         JUDGE MORRIS:  Did you not give Ms. Byford a copy

14   of all documents that you were going to put in Exhibit here

15   today?

16         STUART KOSSAR:  No, it was -- it was all uploaded

17   to ECF with the exception of the first Exhibit and it was

18   emailed to her.

19         JUDGE MORRIS:  So she did have a copy?

20         STUART KOSSAR:  Yes.

21         JUDGE MORRIS:  When did you give it to her?

22         STUART KOSSAR:  Last week, I believe.

23         JUDGE MORRIS:  Okay.

24         STACEY BYFORD:  No objection, Your Honor.

1        JUDGE MORRIS:  Okay.  Admitted.  You put it on the

2   wrong one.

3        STUART KOSSAR:  Upside down.

4        [Denial letter pre-marked as Exhibit G]

5        Q    Mr. Bell, I call your attention --

6        JUDGE MORRIS:  First, who is John Connling

7   [phonetic].

8        THE WITNESS:  Mr. Connling is a paralegal at our

9   office.

10       JUDGE MORRIS:  Okay.  So this is not from Mr. Bell

11  or anybody else, it's from your law firm?

12       STUART KOSSAR:  Correct.

13       JUDGE MORRIS:  Okay.  Who signed the letter?

14       STUART KOSSAR:  The letter is signed by the Loss

15  Mitigation Department.

16       JUDGE MORRIS:  So there's actually no signature

17  again, right?  Because there is no signature on any of this.

18       STUART KOSSAR:  No, Judge.

19       Q    Mr. Bell, I call your attention to Page 3 --

20  A    Mmm-hmm.

21       Q    -- of Exhibit G.  And I call your attention to the

22  first line of Exhibit G.  Can you please read that back to the

23  Court?

24  A    You did not provide proof of a good faith down payment.

1    The amount of a good faith down payment is insufficient to offer

2    a loan modification.

3         Q    And is there a notation next to that document?

4    A    There is an X next to it.

5         Q    Thank you.  And Mr. Bell --

6         JUDGE MORRIS:  Let's make the record clear on that

7    so my memory is completely clear when I write this opinion.

8    The X is by a -- the amount of good faith down payment is

9    insufficient to make a loan modification.  Is that what you

10   -- is that what you testified to?

11        THE WITNESS: I believe it's all connected, ma'am.

12   It's the entire phrase there, both parts of it.  The first --

13   both sentences.

14        JUDGE MORRIS:  Okay.  Let me make the record clear

15   from what I see and I will do this on when I see the opinion.

16   There are two sentences.  It looks like there's space to have

17   a X by either one or both and there is simply an X by the second

18   sentence, the amount of the good faith down payment is

19   insufficient to offer a loan modification.  And your testimony

20   here today is it's both of them.

21        THE WITNESS:  No, my testimony is that they -- they

22   are interconnected since the amount of the good faith down

23   payment is zero from the customer, it is insufficient to offer

24   loan modification.

1           JUDGE MORRIS:  And the signature block would you,

2   let's look at that again, please.

3           THE WITNESS: It's actually, if you go back to the

4   next page, please.  It actually references a gentlemen by the

5   name of Brian Pound as the single point of contact in the Third

6   Paragraph of that document.

7           JUDGE MORRIS:  Point to it for me.

8           THE WITNESS:  I can't.

9           STUART KOSSAR:  Judge, may the witness step down.

10          JUDGE MORRIS:  I know.  I see, Brian Pound at

11  Rushmore Loans.  Now, you're not Rushmore though?

12          THE WITNESS:  They are -- They are my servicer.

13          JUDGE MORRIS:  So who is Brian Pound?

14          THE WITNESS:  Brian Pound works in our Loss

15  Mitigation Department at Rushmore --

16          JUDGE MORRIS:  At Rushmore.  Wait a minute, but who

17  are you?

18          THE WITNESS:  I am William Bell.  I work for

19  Roosevelt Management Company which is the administrator of

20  the trust of this loan.

21          JUDGE MORRIS:  So you said, "Our."

22          THE WITNESS:  Yes, I have a relationship --

23          JUDGE MORRIS:  You're using some pronouns here

24  that are really confusing me.

1        THE WITNESS:  Rushmore is -- as the administrator

2   of the trust they are the servicer of my loan -- my loans, some

3   of my loans.

4        STUART KOSSAR:  May I continue, Judge?

5        JUDGE MORRIS:  Sure.  But it's a different company.

6   You can't hire and fire Brian.

7        THE WITNESS: I -- I cannot, no.

8        JUDGE MORRIS:  Go ahead.

9        THE WITNESS:  But I do work with Brian.

10        JUDGE MORRIS:  I wanted to see how signed this.

11   Turn it over to the signature page and show me who signed it.

12   Loss Mitigation Department of Rushmore Loan.

13        THE WITNESS:  Yes.

14        JUDGE MORRIS:  So Rushmore made this decision, not

15   you Mr. Bell?

16        THE WITNESS:  Rushmore made this decision at my

17   direction.

18        JUDGE MORRIS:  Go ahead.

19        Q    Mr. Bell, after this letter was issued, which has

20   been submitted into evidence as Exhibit G, did you receive any

21   further documentation from the debtor?

22   A    No.

23        Q    And Mr. Bell, other than reviewing the documents in

24   connection with this modification under the investor

1    guidelines, which require the 25% down payment, are there any

2    other modifications options available here?

3    A    There is not.

4         Q    Why not?

5    A    Because that is our loan modification program.

6         Q    And have you received any payments during the

7    pendency of this bankruptcy proceeding?

8    A    We have not.

9         STUART KOSSAR:  Your Honor, I have no further

10   questions at this time.

11        JUDGE MORRIS:  Very good.  Cross.

12                          CROSS EXAMINATION

13   BY MS. BYFORD:

14        Q    Good afternoon, Mr. Bell.  Mr. Bell, as you know in

15   connection with this hearing, Mr. Kossar was asked to produce

16   the guidelines that support Rushmore's decision to deny Ms.

17   Hosking a loan modification, you're aware of that, right?

18   A    Yes.

19        Q    And you're aware that, what was submitted to the

20   Court and also provided to me yesterday is what Mr. Kossar just

21   showed you as Exhibit A?

22   A    Correct.

23        Q    Correct?

24   A    Mmm-hmm.

1    Q    And three times on the record yesterday, Mr. Kossar

2    indicated that these are in fact the guidelines, do you agree

3    with that statement?

4    A    I do.

5    Q    Is this page a copy, a partial copy of a more complete

6    page?

7         STUART KOSSAR:  Objection, what is she referring

8    to?

9         JUDGE MORRIS:  Overruled.  I want to hear the

10   answer to this question.

11   A    That document is a -- is a redaction of a larger matrix

12   for multiple investors.

13   Q    And how many pages is that larger matrix?

14   A    I don't know off the top of my head a couple --

15   Q    But your testimony is that this is the only portion

16   of that matrix that has any barren whatsoever on Ms. Hosking's

17   loan and her request for a modification?

18   A    Correct.

19   Q    Okay.  Do you know who Mr. Acorn [phonetic] is?

20   A    Mike Acorn?

21   Q    Michael Acorn, yes?

22   A    I do.

23   Q    Who is that?

24   A    Mike Acorn works in our Litigation Department, works at

25   Rushmore's Litigation Department.

1    Q    Okay.  Back to what the Judge indicated earlier, you

2    used the pronoun "our" quite often and I too --

3    A    Mmm-hmm.

4    Q    -- find it a bit confusing.  You work for Roosevelt,

5    correct?

6    A    Mmm-hmm, correct.

7    Q    And you work with Rushmore?

8    A    Correct.

9    Q    Okay.  And Mr. Acorn works for Rushmore?

10   A    That is correct.

11   Q    And have you seen the affidavit that he submitted

12   in this case?

13   A    I don't believe I have, actually.

14   Q    I don't know that we need to mark  this as Exhibit

15   --

16        STUART KOSSAR:  It's on NCF.

17        JUDGE MORRIS:  It's on NCF, I'll just take judicial

18   notice of it.  It will be.

19        STACEY BYFORD:  Okay.

20   Q    Have you seen the affidavit?

21   A    I have now.

22   Q    You have now.  Is that what you said?

23   A    Correct.

24   Q    Okay.  So I'm going to turn Page 2, Paragraph #6

25   where in reference to Exhibit A.

1    A    Mmm-hmm.

2        Q    Mr. Acorn states in essence, the investor guidelines

3    and we agreed in Exhibit A, investor guidelines --

4    A    Right.

5        Q    -- right?  Are the key operational rules used by the

6    investor in servicer to operate its business, did I read that

7    accurately?

8    A    Yes.

9        Q    Do you agree with that statement?

10   A    Yes.

11       Q    You indicated earlier that your group, meaning your

12   group at Roosevelt --

13   A    Mmm-hmm.

14       Q    -- makes all of the economic decisions regarding

15   loan modifications, do you recall that testimony?

16   A    Correct.

17       Q    How many people are in your group?

18   A    There are including myself four.

19       Q    Four people.

20   A    Mmm-hmm.

21       Q    Okay.  But you also testified that you are the only

22   person at Roosevelt who has ultimate decision making authority

23   and you in fact are the one and the only one who denied Ms.

24   Hosking's request for modification, correct?

25   A    That is correct.

1        Q      Okay.  What involvement if any did the underwriters

2    at Rushmore that you referenced earlier, has in connection with

3    Ms. Hosking's application for a loan modification?

4    A      They -- They review the documents, determine the income,

5    run the calculations based on that income and then submit that

6    file for review.

7        Q      Submit it to who for review, your group or you?

8    A      My group, myself for review and then we review it.

9        Q      Okay.  And then you tell Rushmore whether to grant

10    the application or deny the application?

11    A      That is --

12            STUART KOSSAR:  Objection.

13            STACEY  BYFORD:   I'm  just  repeating  what  he's

14    already testified earlier.

15            JUDGE MORRIS:  Overruled.

16        Q      Is that correct?

17    A      We do provide that, yes?

18        Q      Okay.   And  in  this  instance,  you  instructed

19    Rushmore to issue a denial letter to Ms. Hosking, right?

20    A      That is correct.

21        Q      Okay.  The four people in your group --

22    A      Mmm-hmm.

23        Q      -- when they come onboard at Roosevelt, are they're

24    given a copy of Exhibit A?

25    A      They are.

1  Q    Okay.  And to your knowledge, do the underwriters

2  at Rushmore all have a copy of Exhibit A?

3  A    Yes.

4  Q    When reviewing a request for a loan modification

5  such as Ms. Hosking in this case, are there any other documents

6  to your knowledge that the folks at the Rushmore, the

7  underwriters look at, internal documents.  I'm not talking

8  about documents submitted by the mortgager other than Exhibit

9  A?

10         STUART KOSSAR:  Objection.

11         STACEY BYFORD:  What's the objection?

12         STUART KOSSAR:  Asking for information about

13  Rushmore, he's the investor.

14         STACEY BYFORD:  I'm asking to his knowledge, if he

15  has no knowledge, he'll tell me.

16         JUDGE MORRIS:  Overruled.

17  A    They utilize that matrix to the best -- to the best of

18  my knowledge to the --

19  Q    To the best of your knowledge did they utilize

20  anything else when they receive a package from a mortgager,

21  from the debtor, they're looking at the documents submitted

22  by the mortgager, are they looking at any other internal

23  documents or any other documents that have not been submitted

24  by the mortgager other than Exhibit A?

25  A    I do not believe so.

1    Q    Okay.  And at Roosevelt, you and the -- are you by

2    the way included in the four people in your group?

3    A    Yes.

4    Q    So there's three others and there's you?

5    A    Correct.

6    Q    And you're the boss of the three others?

7    A    Correct.

8    Q    And they do the initial review and then it ultimately

9    winds up on your desk?

10   A    Correct.

11   Q    Okay.  Do those folks each have a copy of Exhibit

12   A?

13   A    Yes.

14   Q    When they receive from Rushmore the packet that the

15   mortgager has submitted is there any other document or

16   information that they review to make their recommendation

17   other than Exhibit A?

18   A    They would review the -- the servicing notes and

19   understand the status of the loan.

20   Q    When you say servicing notes, what do you mean by

21   that?

22   A    The servicing notes that are kept on the file.

23   Q    Who make the servicing notes?

24   A    Rushmore does.

1        Q    Okay.  And do they make those notes in connection

2    with their review of the mortgager's documents?

3    A    No, they're overall notes for throughout the life of the

4    loan.  But for making investor decisions, that matrix is the

5    driving document.

6        Q    Okay.  How -- do you have any knowledge at all,

7    strike that.  Do you or any of the people in your department

8    have any involvement whatsoever in the training of the

9    underwriters at Rushmore?

10    A    We do not.

11        Q    Do you have any knowledge about how they're trained?

12    A    I know they go through an overall three week course I

13    believe to be trained.

14        Q    And the three other people besides yourself in your

15    department, what can you tell me about the kind of training

16    they receive on reviewing and making recommendations?  Am I

17    correct in saying that they made recommendations to you --

18    A    Correct.

19        Q   -- and you make the decision?

20    A    Correct.

21        Q    What training are they provided regarding --

22    A    They go -- They go through a training where we review files

23    together to kind of train and talk about what items we would

24    be looking for, reviewing the matrix and understanding the

25    income documents that -- that are being provided so we can,

1    you know, QC and check those.  They -- They're all experienced

2    mortgage professionals so they -- they've been in the business

3    for a long time.  So they have -- they have experiences outside

4    of just the training that -- that is provided.

5         Q    Who provides the training to them, you?

6    A    I do.

7         Q    Does anyone else?

8    A    No.

9         Q    Okay.  How long would you say the training lasts?

10   A    They're going to be in training for at -- for at least

11   60 days before they're, making any sort of decisions.

12        Q    What portion of that 60-day training is dedicated

13   to Exhibit A?

14   A    It's very early in the process.  So it's -- it's probably

15   a day of review of loan modifications.

16        Q    Do you recall on Exhibit A, it says a target down

17   payment?

18   A    Mmm-hmm, correct.

19        Q    What's target mean?

20   A    Target is that, that is -- that is what we're looking for

21   on a -- on a loan modification.

22        Q    Is it 25% down payment a requirement for a loan

23   modification in each and every case?

24             STUART KOSSAR:  Objection.

25             JUDGE MORRIS:  Overruled.

1    STUART KOSSAR:  Is she referring to this particular

2    loan?

3    THE WITNESS:   Particular loan.

4    JUDGE MORRIS:  It doesn't make any -- no.  She said,

5    the question was is it required in each and every case.

6    THE WITNESS:  It is not required in each and every

7    case.

8    Q    Explain that to me.  In which cases, is it required

9    and which cases is it not required?

10   A    It will depend on the -- the history of the file, what

11   has happened in the past, what other items are -- are going

12   on within the file.

13   Q    Have you ever granted a loan modification on a loan

14   like Ms. Hosking's without the provision of a down payment?

15   A    With her case, I would say no.

16   Q    I'm not asking about her case.

17   A    I'm saying as a general statement, if I categorize cases

18   with her case history, we would require the 25% down payment.

19   Q    And again, going to back to target down payment, what

20   if hypothetically a down payment was offered that was less than

21   25%, might you in that case grant the application

22    for loan modification?

23   A    It would be -- It would be reviewed on its merits.  I don't

24   believe any has been offered in this case.

1    Q    What was it about Ms. Hosking's case that caused you

2    to insist on this 25% down payment?

3    A    Based on the review of the file, the -- the multiple loan

4    modifications that had been not performed upon and the length

5    of the case in default, we would be looking for the 25% down

6    payment on this case.

7    Q    Mmm-hmm -- Did you at any time to your knowledge,

8    strike that.  To your knowledge, did your Counsel and you

9    recognize that it was your Counsel that was communicating with

10   my office regarding Ms. Hosking's modification application,

11   correct?

12            STUART   KOSSAR:    Objection,  extent   to   the

13   attorney/client privilege on what's communicated.

14            STACEY BYFORD:  I haven't asked anything about that.

15            JUDGE MORRIS:   She hasn't asked anything yet.

16   That's sustained at this moment.  I think the letter is on the

17   record and I'm supposing that she's about to ask a question

18   about what was communicated through your office, not about

19   information between attorney/client -- let me caution you, I

20   will not allow a question between attorney and client but what

21   has been communicated I will allow.

22            STACEY BYFORD:  I understand that, Your Honor.

23   Q    To your knowledge, Mr. Bell,  did Mr. Kossar or

24   anyone from the Loss Mitigation Department at his firm ever

1    advise Ms. Hosking or anyone at my office that a 25% down

2    payment was required?

3    A   I -- I don't know the answer to that.

4    Q   Let me ask you another question.

5    A   I'm not privy to that information.

6    Q   You testified a few minutes ago that in your

7    experience in every case like Ms. Hosking, her kind of a loan,

8    you have insisted that they're be a down payment, correct?

9    A   Correct.

10    Q   And that down payment could have been 25% or some

11    lesser amount, correct?

12    A   We have seen that happen, yes.

13    Q   Are you aware that Mr. Kossar's office advised us

14    that if Ms. Hosking was not able to make a down payment she

15    should write a letter explaining why she could not make the

16    down payment?

17    A   I don't -- I don't know what was advised by the office.

18    I can't testify to that.

19          STACEY BYFORD:  Just give me a moment, Your Honor.

20          JUDGE MORRIS:  Certainly.

21          STACEY BYFORD:  Did you already mark this as in the

22    Exhibit?

23          STUART KOSSAR:  I believe so.

24          STACEY BYFORD:  [Indiscernible].

1    STUART KOSSAR:  Correct, it was the first page of

2    one of the Exhibits.

3    STACEY BYFORD:  [Indiscernible].

4    STUART KOSSAR:  Yes.

5    STACEY BYFORD:  [Indiscernible]

6    STUART KOSSAR:  [Indiscernible]

7    STACEY BYFORD:  Okay.  It's fine.

8    STUART KOSSAR:  I think it was in one of those

9    Exhibits.

10    Q    While he's looking for that, Mr. Bell, I'm going to

11    show you what was previously marked and offered into evidence

12    as Exhibit F?

13    A    Mmm-hmm.

14    Q    Exhibit F was a more [indiscernible] document --

15    A    Yes, I recall that, yes.

16    Q    -- [indiscernible] do you recall seeing this

17    earlier?

18    A    Yes.

19    Q    And you do see that this email to my office from Mr.

20    Kossar's office --

21    A    Mmm-hmm.

22    Q    -- dated September 2nd, correct?

23    A    Yup.

24    Q    And you see there that it says that our client,

25    meaning you --

1    A    Mmm-hmm.

2    Q    -- request an additional to pay stubs, proof of down

3    payment or letter of explanation as to why no down payment

4    available, do you see that?

5    A    I do.

6    Q    Do you know why that was requested of Ms. Hosking?

7    A    Just for additional information about her case, so we have

8    additional.

9    Q    Have you in your experience before ever offered a

10   modification in a case such as this one where the mortgager

11   was unable to make a down payment but offered an explanation

12   as to why the down payment could not be made?

13   A    Based on the case of this, the facts of this case, I -

14   - I would not have approved a trial plan without a down payment.

15   Q    That wasn't my question.  My question is in any of

16   the prior cases that you have reviewed --

17   A    Mmm-hmm.

18   Q    -- and made decisions on, similar to this one with

19   Ms. Hosking, have you ever granted a modification where the

20   mortgager was not able to make the requisite down payment but

21   did offer a letter of explanation as to why the down payment

22   couldn't be made?

23   A    No.

1    Q    If Ms. Hosking had submitted, a letter of
2    explanation in this case as your Counsel requested of her,
3    would that had changed your decision on this file?
4    A    I --
5         STUART KOSSAR:  Judge, it calls for speculation.
6         THE WITNESS:  -- I don't want the letter says so I
7    have no idea.
8         STACEY BYFORD:  Let me --
9         JUDGE MORRIS:  Just answer it anyway.
10        STACEY BYFORD:  I might rephrase the question.
11        JUDGE MORRIS:  Overruled.
12   Q    If there had been a letter of explanation from Ms.
13   Hosking as to why should could not afford to make a 25% down
14   or any percent down payment, might that have affected your
15   decision on her application?
16   A    Based on the facts of the case, likely no.
17   Q    So what you're saying is there's nothing that Ms.
18   Hosking could have said in that letter of explanation that
19   would have caused you to grant her modification?
20   A    I don't know what was in the letter so I can't speak to
21   hypotheticals.
22   Q    Well, it's not really hypothetical because I was
23   just asking you is there anything that she could had said to
24   save the date in this case?
25   A    Again, hypothetical, there's nothing of record to

1    discuss.

2              STUART KOSSAR:  INC [phonetic], I don't think it's

3    input to me.

4              STACEY BYFORD:  What letter are we on?  H?

5              STUART KOSSAR: I think we're on H.

6              STACEY BYFORD:  I'm pretty sure you already offered

7    this but Your Honor, I'd like to offer Exhibit H.

8              JUDGE MORRIS:  Any opposition.

9              STUART KOSSAR:  No, Judge.

10             JUDGE MORRIS:  Okay.  Admitted.

11   [Email dated September 5th admitted into evidence at Exhibit H]

12        Q    Mr. Bell, I'm showing you what you've marked and been

13   admitted into evidence as Exhibit H, absence the highlighting

14   on this document, have you seen this before?

15        A    I believe so.

16        Q    Do you recall seeing it in connection with your

17   preparation for your appearance here today?

18        A    I don't actually remember seeing this specific letter.

19   I remember seeing the other ones we've reviewed but not this

20   one specifically.

21        Q    At the bottom, you see this is an email from Danielle

22   Carlton Murphy, [phonetic] she's an employee in my office.

23   This is dated September 5th.

24        A    Mmm-hmm.

25        Q    And it is addressed to Loss Mitigation which we now

1    know is Mr. Kossar's office, correct?

2    A    I believe that's the [indiscernible] we're working under.

3    Q    And you see there that she says I still need

4    clarification on the "proof of down payment" please explain.

5    Do you see that?

6    A    I do.

7    Q    Okay.  And do you see at the top half of that letter

8    on that same date that there was a reply from Mr. Kossar's

9    office to Ms. Carlton Murphy at my office stating in regards

10   to the down payment our client requires a down payment.  Your

11   client must advise how much of a down payment they can make

12   and provide proof of funds for sending it.  If your client is

13   unable to make a down payment, a letter of explanation signed

14   and dated must be provided.  Did I read that accurately?

15   A    Yes.

16   Q    Okay.  So I'm going to ask you again, were you aware

17   at any time, that your Counsel was requesting from my office

18   and from my client a letter of explanation as to why she could

19   not make a down payment?

20   A    I believe you've already put that in record.

21        JUDGE MORRIS:  Answer the question.

22        THE WITNESS:  Based on the documents reviewed, that

23   would be yes.

24   Q    And again, just showing you Exhibit H one more time,

25   the date of this explanation from Mr. Kossar's office was

1    September 5th, correct?

2    A    Yes.

3         Q    Okay.  Do you know whether Ms. Hosking ever offered

4    a letter of explanation?

5    A    In my review of the file, I did not see one.

6              STACEY BYFORD:  I would like to offer Exhibit I.

7              JUDGE MORRIS:  Any objection?

8              STUART  KOSSAR:    Judge,  I  would  just  request

9    information as to where that's transmitted from.  It looks

10   like it's a fax image.  I'm not sure how it was transmitted.

11   I'm not sure.  Are you submitting it into evidence for the

12   facts of what it says in the letter or how it was transmitted?

13             STACEY BYFORD:  I'm not submitting it to show it how

14   it's transmitted.  I'm just submitting it so that your --

15             JUDGE MORRIS:  It's me you'll talk to.

16             STACEY BYFORD:  I'm sorry.  I'm submitting it so

17   that Mr. Bell -- to ask Mr. Bell if he's ever seen this which

18   is a letter from Veronica Hosking that was faxed on September

19   9, 2014, from Staples.

20             JUDGE MORRIS:  I will allow that question.  Show

21   him the document.

22   [Explanation letter from Ms. Hosking marked into evidence as Exhibit

23   I]

24        Q    Mr. Bell, I'm showing you what was marked as Exhibit

25   I.  Have you seen this document before?

1    A    I don't recall ever seeing this document.

2        Q    Okay.  Just do you agree with me that it is facsimile

3    transmission on September 9th and that is signed by Veronica

4    Hosking?

5            STUART KOSSAR:  Objection, speculative in terms of

6    what --

7            JUDGE MORRIS:  Yeah, you can't testify to that also.

8            THE WITNESS:  I didn't.

9            JUDGE MORRIS:  I will sustain that objection.  Do

10   you have Page 1 of that?

11           STACEY BYFORD:  No, I don't, Your Honor.

12           JUDGE MORRIS:  Which is the cover page, I'm sure.

13           STACEY BYFORD:  Yes.

14           JUDGE MORRIS:  Your client can testify if she's seen

15   it.

16       Q    Going back to Exhibit H, which we just looked at.

17   A    Mmm-hmm.

18       Q    That was sent to my office on Friday, September 5th,

19   correct?

20           STACEY BYFORD:  Did you already put this one in?

21           STUART KOSSAR:  No, yes.

22       Q    Mr. Bell, I'm showing you what's already been

23   admitted as Exhibit F, do you recall seeing this earlier?

24   A    Yes.

1    Q    And do you agree with me that this is now an email

2    from Mr. Kossar's office to Ms. Carlton Murphy at my office

3    dated Tuesday, September 9th --

4    A    Mmm-hmm.

5    Q    -- at 12:29 in the afternoon, so a mere one and half

6    business days after a request was made after a letter of

7    explanation, correct?

8    A    I don't think we verified that other document.  So I can't

9    -- I can't answer that.

10    Q    I'm talking about Exhibit H.

11    A    Oh, Exhibit H, not yet-- not the fax?  Yes.

12    Q    3:22 -

13    A    Yes.

14    Q    -- in the afternoon --

15    A    September 5th.

16    Q    -- September 5th.

17    A    Okay.

18    Q    Letter of explanation is requested, correct?

19    A    Correct.

20    Q    One and half business days later approximately at

21    noon on Tuesday, September 9th, there was an email from Mr.

22    Kossar's office indicating that we have not received any

23    information in regards to a down payment, your client is being

24    processed with no down payment.  Did I read that accurately?

25    A    That is what it says, yeah.

1    Q    Are you the person who made the decision to go ahead

2    and process Mrs. Hosking's application without proof of funds

3    for a down payment?

4    A    I think probably the better way to describe that is the

5    review, not the app -- not the reviewing even it without the

6    down payment which -- which they will do.

7              JUDGE MORRIS:  That was a yes or no.  Answer it yes

8    or no.

9    A    Please rephrase the question.  Ask the question again,

10   please?

11   Q    I'm asking whether you had any involvement in the

12   decision to go ahead and review Ms. Hosking's application

13   without the down payment or an explanation as to why a down

14   payment could not be made?

15   A    No, I would not had made that decision.

16   Q    Who made that decision?

17   A    The Loss Mitigator at Rushmore would had made that

18   decision.

19   Q    What's the name of the individual in your group who

20   reviewed Ms. Hosking's application before it landed on your

21   desk?

22   A    Andrew Coup.

23   Q    And what did Mr. Coup provide to you to review in

24   order for you to make your decision?

25   A    I would have actually received all the documents from

1    Rushmore.

2        Q    Did you receive a written recommendation from Mr.

3    Coup?

4    A    A very small write-up.

5        Q    What's very small?

6    A    A sentence maybe.

7        Q    What would the sentence say anything more or less

8    than I recommend that you deny or grant this application?

9            STUART KOSSAR:  Judge, speculative.

10           STACEY BYFORD:  I don't see how it's speculative.

11   It's not been offered --

12           JUDGE MORRIS:  Overruled.

13           STACEY BYFORD:  -- or reviewed it.

14           THE WITNESS:  It would be something similar to

15   that, yes.

16           JUDGE MORRIS: Similar to –

17           THE WITNESS:  -- her -- she led me with that

18   question.

19           STACEY BYFORD:  It's cross-examination I can do

20   that.

21           JUDGE MORRIS: Yes, she can.

22           THE WITNESS:  I'm -- I'm aware.

23       Q    So let me ask it another way.

24   A    Sure.

1       Q    Do you as you sit here today recall the written

2  recommendation provided by Mr. Coup?

3  A    Yes.

4       Q    What did it say?

5  A    It said, "Recommend denial due to no down payment."

6  Something along those lines.

7       Q    Do you recall there being any other basis stated for

8  the denial --

9  A    No.

10       Q    -- such as for example, insufficient income?

11  A    No.

12       Q    Such as for example, prior performance?

13  A    I do not believe so but it was referenced in Rushmore's

14  write-up.

15       Q    I was just asking you what Mr. Coup wrote to you in

16  his recommendation, you don't recall anything like that?

17  A    No.

18       Q    And I'm showing you again what was admitted into

19  evidence earlier as Exhibit G?

20  A    Mmm-hmm.

21       Q    Do you recall that?  This is the denial letter,

22  correct?

23       Q    Correct.

24  A    Correct.

25       Q    And do you agree with me that this appears to be

1    a form letter where Rushmore would check off the basis that

2    applied in a particular case?

3            STUART KOSSAR:  Objection to the characterization

4    before?

5            JUDGE MORRIS:  Overruled.

6            THE WITNESS: This is their -- their standard denial.

7        Q    And  would you agree with me that the only basis for

8    the denial indicated in this letter is Ms. Hosking's inability

9    to make a down payment?

10   A    Correct.

11       Q    Do you know whether Rushmore is licensed to service

12   loans in  New York?

13   A    From my best recollection, yes.

14       Q    Would it to surprise you to learn that they're not?

15   A    It would.

16           STACEY BYFORD:  I have no further questions, Your

17   Honor.

18           STUART KOSSAR:  Yeah, Your Honor, may I brief --

19           JUDGE MORRIS:  Let me ask -- yes, but let me ask

20   a couple of questions before you do.  Would you Exhibit A up

21   on this first, the one that's the clearest.  Okay.  Target

22   down payment 25%.  How would anyone in your department or over

23   at Rushmore know how to deviate from that?

24           THE WITNESS:  I don't understand the question.

1      JUDGE MORRIS:  It says target down payment is 25%

2   and you've testified today that, that's not always what the

3   down payment is whether it's more or less is immaterial.  How

4   would -- where are the guidelines that you give someone at

5   Rushmore the ability to say this -- a 10% is warranted here,

6   a 50% is warranted is, a 6% is warranted here.  Where are those

7   guidelines?

8      THE  WITNESS:   I  don't  believe  there  is  any

9   guidelines on that topic to the best of my knowledge.

10     JUDGE MORRIS:  Okay.  Then let me ask you a question

11  on the third from the bottom.  It says here you are a HAMP

12  participant.

13     THE WITNESS:  And it says only on those specifically

14  noted as HAMP.

15     JUDGE MORRIS:  Well, that would mean they have to

16  be reviewed as HAMP.

17     THE WITNESS:  No, HAMP is a program that they have

18   to be opted into by the prior servicer when we service loans.

19  So they come over to us HAMP eligible or not HAMP eligible.

20     JUDGE MORRIS:  Do you know what HAMP is?

21     THE WITNESS:  I do.

22     JUDGE MORRIS:  Explain it to me.

23     THE  WITNESS:   It's  a  --  It's  a  Federal  loan

24  modification program for specific loans.

25     JUDGE MORRIS:  Okay.  Your questions.

1    STUART KOSSAR:  Thank you, Judge.

2                    RE-DIRECT EXAMINATION

3    BY MR. KOSSAR:

4    Q    Mr. Bell, how long have you been in the business of

5    reviewing loan modifications for?

6    A    15 years.

7                    JUDGE MORRIS:  Asked and answered.

8                    STUART KOSSAR:  I just --

9                    JUDGE MORRIS:  And I remember.

10   Q    Mr. Bell, again so that we can clarify all the

11   information that you reviewed after your determination after

12   reviewing all this information, what did you determine?

13   A    We determined that without the good faith down payment

14   that we did not feel comfortable offering a loan modification

15   on this asset.

16   Q    And did you apply the guidelines that you provide

17   today in Exhibit A to this particular loan?

18   A    We did.

19                   STUART BYFORD:  Nothing further.

20                   JUDGE MORRIS:  Redirect.

21                   STACEY BYFORD:  I have nothing further, Your Honor.

22                   JUDGE MORRIS:  You may step down.

23                   THE WITNESS:  Thank you, Your Honor.

24                   JUDGE MORRIS:  We're here on good faith.  Anything

25   else you wish to --

1    STUART KOSSAR:  I would request at the end of the

2    hearing I have an opportunity to heard on the merits of the

3    case.  But I haven't nothing further in terms of questioning.

4         JUDGE MORRIS:  Say that again.

5         STUART KOSSAR:  At the close of today's hearing, I

6    request an opportunity to be heard as to the merits of the case.

7    But in terms of the questioning for Mr. Bell, I have nothing

8    further.

9         JUDGE MORRIS:  Do you want to argue the law to me?

10        STUART KOSSAR:  No, I do not.  I just want to

11   provide some issues [phonetic] of the facts.

12        JUDGE MORRIS:  What about the merits?  I've heard

13   the testimony.  So what about the merits do you want to --

14        STUART KOSSAR:  Judge, I would just briefly point

15   out that the client today as testified that they have a 25%

16   --

17        JUDGE MORRIS:  You can't testify.  He testified.

18   I've heard him.

19        STUART KOSSAR:  Correct, I'm saying my client

20   testified today that he has a guideline that requires a 25%

21   down payment.  He's reviewed the package pursuant to those

22   guidelines.

23        JUDGE MORRIS:  Don't make up the testimony for me,

24   Mr. Kossar.  You will have me on you.  I heard the testimony

1    and you're characterizing it differently than I absolutely

2    heard clearly.

3            STUART KOSSAR:  Well, I do not surely make the --

4            JUDGE MORRIS:  And that is not what he said.

5            STUART KOSSAR:  Okay.

6            JUDGE MORRIS:  So you be careful on own ethics.

7    Don't get his ethics involved in your ethics.

8            STUART KOSSAR:  Understood Judge, I was just

9    attempting to point out that he --

10           JUDGE MORRIS:  I heard you.

11           STUART KOSSAR:  -- he complied with his guidelines.

12           JUDGE MORRIS:  I heard you.  I'm protecting you

13   right this moment.  Anything else you wish to add?

14           STACEY BYFORD:  You Honor, may I call, Ms. Hosking?

15           JUDGE MORRIS:  Yes, you can.

16   (The witness is sworn)

17                  DIRECT EXAMINATION

18           JUDGE MORRIS:  You may be seated and state your full

19   name.

20           VERONICA HOSKING:  Veronica Cynthia Hosking.

21           JUDGE MORRIS:  And Ms. Hosking, your address

22   please.

23           VERONICA HOSKING:  3 Hook Road, Unit 64D

24   Poughkeepsie, New York  12601

25           JUDGE MORRIS:  Very good.  She's your witness.

1    BY MS. BYFORD:

2         Q    Good morning, Ms. Hosking.

3    A    Good morning.

4         Q    Do you reside in a townhouse, a condo, a house?

5    A    A condo.

6         Q    And how long have you've resided there?

7    A    Since 1994.

8         Q    Do you have any children?

9    A    I have a son, adopted son.  He's 26.

10         Q    Does he live with you?

11    A    No, he's in California.

12         Q    Where are you employed?

13    A    I'm retired.  But I do a temp with Ethan Allen through

14    Q-Search [phonetic].

15         Q    Is that your only employment?

16    A    Yes.

17         Q    Do you have any other sources of income?

18    A    I have Social Security disability.  I have a pension from

19    Archdiocese of New York and from the school system, the New

20    York State school system.

21         Q    I want to show you what was marked earlier as Exhibit

22    I.

23    A    Mmm-hmm.

24         Q    Do you recognize that document?

25    A    Yes.

1      Q    Can you tell me what it is?

2   A    That's a letter that I said that I don't have the funds

3   for the down payment and that I'm working part time to -- to

4   make these payments and it is signed by me.

5      Q    Do you recall ever being asked by my office for a

6   specific percentage of a down payment?

7   A    No, I don't -- I don't recall that in the hearing.

8      Q    And if you had been offered a trial modification that

9   required payments of $557.46 per month, would you be able to

10  make those payments?

11  A    Yes, I would.

12     Q    But you were not at the time that you wrote this

13  letter on September 9, 2014 --

14  A    Right.

15     Q    -- and are not now able to make any sort of down

16  payment in connection with your application, is that correct?

17  A    That's correct, yes.

18          STACEY BYFORD:  I have no further questions.

19          JUDGE MORRIS:  Cross-examination.

20          STUART KOSSAR:  Thank you, Judge.

21                    CROSS EXAMINATION

22  BY MR. KOSSAR:

23     Q    Good morning, Ms. Hosking.  How are you?

24  A    Good morning.  Fine.  Thank you.

25     Q    When was the last time payment onto your mortgage?

1    A    It was probably about a couple months ago.

2                STACEY BYFORD:  I object.

3                JUDGE MORRIS:  Outside the scope.

4                STACEY BYFORD:  I object to where I think this is

5    going and it's not relevance.

6                JUDGE MORRIS:  It is outside the scope of direct.

7          But she answered.  So you heard it but it's outside the

8    scope of direct.

9          Q    Are you aware of any down payment required to obtain

10   to loan modification?

11   A     I had heard it but I don't know of any specific amounts

12   or anything.

13         Q    What did you hear about it?

14   A    Just what was in the letters, that's it.

15               STACEY BYFORD:  Objection, calls for

16   attorney/client privilege.

17               JUDGE MORRIS:  I have to sustain that objection.

18         Q    What do you know about the down payment requirement?

19   A    It was --  what in the letter, the letters I received.

20         Q     And which letter are you referring to?

21   A     The ones in the Exhibits.

22         Q    And what is your understanding of the down payment

23   based on the letters that you reviewed?

24   A     I don't know I just saw that it was the 25%.

1    Q    So it's your understanding it's a 25% requirement

2    to obtain the modification?

3    A    I don't know if that was the only requirement.  I don't

4    know.

5    Q    Why are you unable to provide a down payment?

6    A    I just don't have that much funds available.

7         STUART KOSSAR:  Nothing further.

8         STACEY BYFORD:  I have nothing further, Your Honor.

9         JUDGE MORRIS:  You may step down.

10        VERONICA HOSKING:  Okay.  Thank you.

11        JUDGE MORRIS:  Yes, sir.  You want to say

12   something?

13        STUART KOSSAR:  Yes, Your Honor.  I would just

14   respectly submit that my client here has made an effort to work

15   in good faith and try to work with a debtor in terms of a

16   modification.  They provide a guideline that they have used

17   when evaluating the modification.  They have applied those

18   guidelines and they have done so in a timely manner.  I

19   respectly submit that they have complied with all aspects

20   required by this Court in terms of working in good faith as

21   well as unto the bankruptcy code to do what they have to do

22   to work in good faith to obtain to work with debtor for a

23   modification.

24        JUDGE MORRIS:  Thank you.  Yes, ma'am.

1          STACEY BYFORD:  Your Honor, I would submit that

2     Rushmore has not acted in good faith in this case at all in

3     reviewing Ms. Hosking's request for a modification in denying

4     that request.  If it was a per say requirement that a down

5     payment be made in order for a modification to granted in a

6     case such as this, there would have been no reason to ask for

7     paystubs or review any other documentation once they knew a

8     down payment couldn't be made there would be no reason to review

9     the application.

10         JUDGE MORRIS:  Very good.  You will receive a

11    written decision.  Court's in recess.

12         COURT CLERK:  All rise.

13     (Whereupon these proceedings were concluded at 10:41 AM)

14

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATION</u>

I, JENNIFER HARPER-GONZALEZ, the assigned transcriber, do

hereby certify the foregoing transcript of proceedings

before the U.S. Bankruptcy Court, Southern District of New

York, on February 25, 2015, on CD, index number from

9:06:06 to 10:41:23; is prepared in full compliance with

the current Transcription Format for Judicial Proceedings

and is a true and accurate non-compressed transcript of

the proceedings as recorded, and to the best of my ability.

*Jennifer A. Harper-Gonzalez*
*March 9, 2015*

JENNIFER HARPER-GONZALEZ                    Date
Schmieder & Meister, Inc.