**FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
                                                            :      Chapter 13

In re:                                          :

                                                            :      Case No. 14-35174   (CGM)

      Veronica C Hosking,                       :

                                                            :

                                        Debtor.       :

                                                            :
---------------------------------------------------------------X

**MEMORANDUM DECISION SANCTIONING RUSHMORE LOAN MANAGEMENT SERVICES FOR FAILURE TO ACT IN GOOD FAITH IN ACCORDANCE WITH THIS COURT'S LOSS MITIGATION PROGRAM PROCEDURES**

**A P P E A R A N C E S :**

Law Office of Stacey P. Byford, PLLC
158 Vineyard Avenue
Highland, NY 12528
*Attorneys for the Debtors*
       By:    Stacey Paige Byford, Esq.

Knuckles, Komosinski, & Elliot, LLP
565 Taxter Road
Suite 590
Elmsford, New York 10523
*Attorneys for US Bank, National Association, not in its individual capacity, but solely as Trustee for the RMAC Trust, Series 2013-1T*
       By:    Stuart L. Kossar, Esq.

**CECELIA G. MORRIS**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

       Before the Court is the issue of whether Rushmore participated in loss mitigation in good faith. The Court finds that Rushmore failed to participate in good faith by failing to inform Debtor of the down payment requirement and for failing to designate a contact with full settlement authority, as stated herein.

## Jurisdiction

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a) and the Standing Order of Reference signed by Chief Judge Loretta A. Preska dated January 31, 2012. This is a "core proceeding" under 28 U.S.C. § 157(b)(2)(A) (matters concerning the administration of the estate).

## Background

Debtor filed for chapter 13 relief on January 31, 2014. Vol. Pet., ECF No. 1. At the time of filing, the amount of Debtor's mortgage arrears was $18,112.26. Claim No. 6-1. On March 4, 2014, Debtor requested loss mitigation with "Rushmore LMS" in her chapter 13 plan. Plan 2, ECF No. 10. On March 27, 2014, Debtor filed an amended plan clarifying her request for loss mitigation with "Rushmore Loan Management Svcs, LLC" ("Rushmore" or "Creditor"). Am. Plan 2, ECF No. 15. The amended plan was served upon Rushmore in accordance with this Court's Loss Mitigation Program Procedures. Cert. Serv., ECF No. 16.

On July 1, 2014, Knuckles, Komosinski & Elliott LLP filed a letter on the docket, which is addressed to Debtor's counsel and states as follows:

> As you may recall, this office represents the interests of U.S. Bank, National Association, not in its individual capacity, but solely as Trustee for the RMAC Trust, Series 2013-1T in the above referenced matter.
> Please allow this letter to serve as our formal request that your office submit a Loss Mitigation Order to the Court no later than July 11, 2014. Your office has failed to submit an Order Granting Loss Mitigation since the petition was filed on March 3, 2014. Such delay by [sic] is extremely prejudicial to our client.
> If an Order Granting Loss Mitigation is not submitted to the Court by July 11, 2014, this office will be requesting that the Court terminate Loss Mitigation.

Ltr., ECF No. 18. The letter was signed by Mark R. Knuckles, Esq, Counsel for U.S. Bank National Association, not in its individual capacity, but solely as Trustee for the RMAC Trust,

Page **2** of **17**

Series 2013-1T ("RMAC Trust"). *Id.* The Order Granting Application for Loss Mitigation ("LM Order") was entered on July 8, 2014. LM Order, ECF No. 19.

The LM Order names Rushmore as a party to loss mitigation and orders that Rushmore comply with the Southern District of New York Loss Mitigation Program Procedures. *Id.* The LM Order also requires that Rushmore "furnish [the Debtor] with written notice of the name, address and direct telephone number of the person who has full settlement authority on the loan in question as well as the attorney or law firm representing the Creditor in the Loss Mitigation." LM Order ¶ 2. The LM Order was served on Rushmore on August 18, 2014. Cert. Serv., ECF No. 28.

On August 8, 2014, Debtor filed a Debtor's Affidavit indicating that documents were sent to Rushmore. Debtor Aff., ECF No 23. On August 12, 2014, a Creditor Affidavit was filed by Mark R. Knuckles, Esq, Counsel for U.S. Bank National Association, not in its individual capacity, but solely as Trustee for the RMAC Trust, Series 2013-1T, indicating that no additional documents were being requested at that time and that the documents provided by the Debtor were being reviewed. Cred. Aff. 1, ECF No. 27. In the Creditor Affidavit, Angeline Horner, Asset Resolution Specialist, was designated as Rushmore's Loss Mitigation contact and Mark R. Knuckles, Esq., of Knuckles, Komosinski & Elliott, LLP, was designated as Rushmore's attorney for Loss Mitigation. *Id.* 2.

On August 20, 2014, Debtor filed a Debtor's Affidavit indicating that bank statements, paystubs, and pension statements had been sent to the Creditor. Debtor Aff., ECF No. 31. On September 2, 2014, Debtor filed a status letter, which states:

> The financial package has been completed, signed and emailed to Knuckles, Komosinski and Elliott, LLP via lossmitigation@kkelaw.com on 8/8/2014. On 8/13/2014 the Creditors attorney requested: recent three months bank statements and specific paystubs and pension statements. On 8/20/2014 we

Page **3** of **17**

> forwarded the information requested via email and are awaiting further correspondence from the Creditors attorney.

Ltr., ECF No. 35. That same day, a Creditor Affidavit was filed on behalf of Rushmore. Cred. Aff., ECF No. 36. In the sworn affidavit, Creditor states that additional documents were needed, including paystubs and "proof of down payment or letter of explanation as to why no down payment [sic] available." *Id.*

On September 24, 2014, Debtor's counsel filed a status report addressed to the Court, which states:

> On 9/5/2014 our office provided the letter of explanation regarding the paystubs as requested by Knuckles, Komosinski & Elliott, LLP. attorney for the creditor. The creditor also requested proof of down payment from the debtor, at this time the debtor does not have funds available for a down payment. The creditor's attorney has informed us that the request for a loan modification is being processed with no down payment.

Ltr., ECF No. 39. On September 26, 2014, Creditor's attorney filed a status letter addressed to the Court, which states:

> As you may recall, this office represents the interests of U.S. Bank, National Association, not in its individual capacity, but solely as Trustee for the RMAC Trust, Series 2013-1T in the above referenced matter.
> Please allow this letter to serve as our Loss Mitigation status report.
> Since the prior Loss Mitigation Status Hearing, held on September 9, 2014, our client has informed us that the debtor's loss mitigation was moving forward with no down payment offer as one has not been provided. The file is currently under review for a decision.
> Additionally, at the prior Loss Mitigation Status Hearing, debtor's counsel indicated that the debtor had recently obtained employment and steady paystubs would be forthcoming. As of today, our office has not been provided with current paystubs.

Status Rpt., ECF No. 40.

On December 3, 2014, Debtor's counsel filed a letter stating that all documents had been sent to Creditor's attorney on September 30, 2014 and Debtor was awaiting a response. Ltr.,

Page **4** of **17**

ECF No. 47.  On December 15, 2014, Creditor's attorney filed a status letter, which is addressed to the Court and states:

> As you may recall, this office represents the interests of U.S. Bank, National Association, not in its individual capacity, but solely as Trustee for the RMAC Trust, Series 2013-1T in the above referenced matter.
> Please allow this letter to serve as our Loss Mitigation status report.
> Since the prior Loss Mitigation Status Hearing, held on October 1, 2014, our client has informed us that the debtor's loan modification was denied as she could not provide a good faith down payment.  The denial letter was provided to debtor's counsel and is attached hereto.
> Based on the above, this office respectfully requests that Loss Mitigation be terminated.

Status Rpt., ECF No. 48. Attached as an exhibit to the December 15, 2014 status letter, is a letter from Rushmore indicating that the Debtor's request for a loan modification had been denied ("Denial Letter").  *Id.*  The Denial Letter indicates that the reason for the denial of the loan modification is that "[t]he amount of good faith down payment is insufficient to offer a loan modification."  *Id.* at 2.  The Denial Letter is dated October 7, 2014.  *Id.* at 1.  The Denial Letter appears to have come from the "Loss Mitigation Department" at Rushmore but has no signature and no one is named at the end of the letter as having authored it.  *Id.* at 3.  The Denial Letter advises the Debtor to contact Brian Pound to discuss additional alternatives to foreclosure and refers to Brian Pound to as the Debtor's "Single Point of Contact."  *Id.* at 1.

At the December 17, 2014 hearing, the Court heard that the Creditor denied the Debtor a loan modification for failure to make a down payment.  The Court ordered a senior Vice President of the Creditor with authority to adjust the loan to appear at the January 21, 2015 hearing.

At the January 21, 2015 hearing, Mike Aiken appeared and stated that the investor guidelines require a down payment. Hr'g Tr. 3:15-17, Jan. 21, 2015. When the Court ordered the

written investor guidelines to be produced for the Court, Mr. Aiken stated that "I think in this case, Your Honor, this isn't necessarily a written document, more than it's a gentleman down the hall . . . ." *Id.* 5:1-3.  Due to that statement, the Court ordered "the person . . . [who] made the denial" and "the written guidelines that say[] [the lack of down payment is] the reason." *Id.* at 6:23-25.  The investor was ordered to appear as well. *Id.* at 8:25-9:1-6.  The Court also stated that the investor should be prepared to testify as to what authority gives it the power to require the down payment and if the answer is going to be the investor guidelines, the Court wants the guidelines produced in writing. *Id.* at 4:16-25.

The Court held an evidentiary hearing on February 25, 2015, at which William Bell testified on behalf of the Creditor, a document purporting to be investor guidelines was produced and the Debtor testified.  Mr. Bell is employed by Roosevelt Management Company, LLC, an investment firm that purchases mortgages.  Trail Tr., Feb. 25, 20105 4:22-5:4.  Rushmore is a mortgage servicer that services loans for Roosevelt.[1]  *Id.*  Based upon a review of the evidence and testimony provided at that hearing, the Court finds that Rushmore failed to participate in this Court's Loss Mitigation program in good faith.

---

[1] Mr. Bell, who is not employed by Rushmore spoke about the organization as if it were interchangeable with Roosevelt Management, the company for which he purportedly works. Yet, at the same time, he had surprising difficulty recalling names of people employed by Rushmore. Tr. 32:13-33:8. ("STACEY BYFORD: . . . What happened after you reviewed all the information in connection with debtor's modification application? A It –- It was determined that we were requesting a good faith down payment from the customer and that the amount -- JUDGE MORRIS: Who's we? THE WITNESS: Rushmore and I as the investor. JUDGE MORRIS: And who at Rushmore? THE WITNESS: They have an entire underwriting department that review files, ma'am.? JUDGE MORRIS: Names of those people? . . . THE WITNESS: I would have to look at the ro[]ster and go through the names. There's multiple employees. JUDGE MORRIS: Can you do that? THE WITNESS: I don't have that information with me today. JUDGE MORRIS: Why did you not bring it today? THE WITNESS: I –- I don't have that information, ma'am."); ("THE WITNESS: Brian Pound works in our Loss Mitigation Department at Rushmore –- JUDGE MORRIS: At Rushmore. Wait a minute, but who are you? THE WITNESS: I am William Bell. I work for Roosevelt Management Company which is the administrator of the trust of this loan. JUDGE MORRIS: So you said, "Our." THE WITNESS: Yes, I have a relationship –- JUDGE MORRIS: You're using some pronouns here that are really confusing me. THE WITNESS: Rushmore is –- as the administrator of the trust they are the servicer of my loan –- my loans, some of my loans. . . . JUDGE MORRIS: Sure. But it's a different company. You can't hire and fire Brian. THE WITNESS: I –- I cannot, no.").

**Discussion**

Since 2009, the Southern District of New York has offered its Loss Mitigation Program in order to facilitate consensual resolutions between debtors and creditors whenever a debtor's residential property is at risk of foreclosure.  Loss Mitigation Program Procedures ("Procedures")[2] at 1; s*ee also In re Bambi*, 492 B.R. 183, 188 (Bankr. S.D.N.Y. 2013) (quoting Hon. Cecelia G. Morris & Mary K. Guccion, *The Loss Mitigation Program Procedures for the United States Bankruptcy Court for the Southern District of New York*, 19 Am. Bankr. Inst. L. Rev. 1, 4 (2011).  "The Loss Mitigation Program aims to facilitate resolution by opening the lines of communication between the debtors' and the lenders' decision-makers."  Procedures, at 1.  "The premise of the Loss Mitigation program is simple: ***Put the decision-making parties in direct contact with each other***, and set a schedule for their discussion as to what can be done about the debtor's home."  Morris & Guccion, *supra*, at 4 (emphasis added).  Direct communication between decision makers is one of the fundamental principles of this Court's Loss Mitigation Program.  *Id.*

To ensure that a meaningful discussion takes place, the Procedures require that parties "negotiate in good faith" and warns that "[a] party [who] fails to participate in Loss Mitigation in good faith may be subject to sanctions."  Procedures, at 5.  To meet the requirement of "good faith," a creditor does not have to offer a loan modification.  *In re A.T. Reynolds & Sons, Inc.*, 452 B.R. 374, 384 (S.D.N.Y. 2011) (holding that parties cannot be forced to make a settlement offer and cannot be coerced into a settlement by the court).  "Good faith" requires the parties to attend conferences, provide any requested memoranda, and produce representatives with settlement authority.  *Id.* at 381.

---

[2] The Loss Mitigation Program Procedures for the Southern District of New York are available on the Court's website at http://www.nysb.uscourts.gov/sites/default/files/LossMitigationProcedures.pdf.

***Whether Rushmore Acted in Good Faith pursuant to the Procedures when it Denied Debtor's Application for Modification of her Mortgage for Failing to Provide a Down Payment?***

After five months in Loss Mitigation, Rushmore denied Debtor's request for a loan modification for failure to provide a down payment. The first time that Rushmore advised the Court and Debtor that a down payment was required in order to be considered for a loan modification was in the Denial Letter, which was emailed to Debtor's counsel and filed with the Court in December 2014.[3] *See* Trial Ex. G (email dated Dec. 8, 2015); Status Rpt., ECF No. 48 (filed Dec. 15, 2015).

When questioned by the Court regarding why the loan was denied, Rushmore insisted that its investor guidelines require a down payment equal to 25% of the arrears on the loan being modified and that the guidelines could not be changed to accommodate a lower down payment for the Debtor in this case. Hr'g Tr. 3:15-17, Jan. 21, 2015, ECF No. 66; Trial Tr. 17:1-3, Feb. 25, 2015, ECF No. 69. Despite numerous requests for documentation of this requirement, Rushmore was unable to produce any credible evidence demonstrating that the investor guidelines required such an outcome.

Rushmore failed to include the fact that a down payment was required in its initial Creditor Affidavit, which was filed on August 12, 2014. *See* Cred. Aff., ECF No. 27. Then, on three subsequent occasions, Rushmore indicated that a down payment would not be necessary so long as the Debtor provided an explanation. *See* Cred. Aff., ECF No. 36 (Debtor needed to provide "proof of down payment or letter of explanation as to why no down payment [sic] available.") (filed on September 2, 2015); Ltr., ECF No. 39 ("The creditor also requested proof of down payment from the debtor, at this time the debtor does not have funds available for a down payment. The creditor's attorney has informed us that the request for a loan modification is

---

[3] The Court notes that the Denial Letter is dated October 8, 2014. No explanation has been given for why Rushmore failed to provide this letter to Debtor's counsel or the Court until December 2014.

Page **8** of **17**

being processed with no down payment.") (filed on September 24, 2015); Status Rpt., ECF No. 40 ("Since the prior Loss Mitigation Status Hearing, held on September 9, 2014, our client has informed us that the debtor's loss mitigation was moving forward with no down payment offer as one has not been provided. The file is currently under review for a decision.") (filed on September 26, 2015).

In the Denial Letter, the reason provided for the Debtor's denial was that "[t]he amount of good faith down payment is insufficient to offer a loan modification." Status Rpt., ECF No. 48. Rushmore elected to declare the down payment was "insufficient" instead of choosing the reason listed directly above it, which states: "You did not provide proof of the good faith down payment." *Id.* By indicating that the reason for the denial was that the down payment was "insufficient" instead of "not provided," the Denial Letter makes it seem like the amount of the down payment is negotiable—if not altogether unnecessary. At no time was it made clear to the Court or to the Debtor that the failure to provide a down payment would result in automatic denial of a loan modification. If that were the case, Rushmore should have communicated that requirement to the Debtor at the outset of the loss mitigation process.

Eventually, the Court held a hearing to consider whether the investor guidelines require a down payment, at which time it became clear to the Court that they do not. To call what Rushmore produced "investor guidelines" takes a vivid imagination. The guidelines take the form of a matrix comprised of two columns of information taking up approximately a third of one page. *See* Trial Ex. A.[4] The guidelines contain abbreviations such as, "Min LTV," "Max FE DTI," and "MSP," without a key that defines what those abbreviations mean. *Id.* The guidelines

---

[4] Due to Rushmore's insistence at trial that the investor guidelines contain information regarding modification of this loan, the Court believes it is necessary to include a copy of this document in its decision. Descriptions of the lack of information contained in this document do it no justice. A copy of the document referred to as Rushmore's investor guidelines are attached as exhibit A to this Memorandum Decision.

Page **9** of **17**

do not indicate that a down payment is required. Instead, they indicate that the "***Target*** Down payment" for Debtor's loan is "25%." *Id.* (emphasis added). The word target indicates that the down payment need not always be 25%. William Bell, the administrator of the RMAC Trust and the "Vice President over [sic] the Asset Management Group,"[5] confirmed in his testimony that the amount of the down payment required varies on a case-by-case basis and depends on "the history of the file, what has happened in the past, what other items are – are going on within the file." Trial Tr. 14:21-25; 53:10-12. He also testified that he has "final authority to make decisions on loan modifications" and as such has the ability to overrule the requirement that Debtor make a 25% down payment. *Id.* at 14:21-25.

From the testimony, it seems that Rushmore's failure to communicate its policy regarding the requirement for a down payment was due to its failure to designate a contact with full settlement authority.

### *Did Rushmore Designate Someone with Full Settlement Authority?*

According to the Procedures, "any secured creditor whether it be the holder, mortgage servicer or trustee of an eligible Loan" is a "Creditor" for purposes of Loss Mitigation. Procedures, at 2. Rushmore was named as the Creditor in the Loss Mitigation Request. By not objecting to the request,[6] Rushmore consented to participate in this Court's Loss Mitigation Program and is deemed to have authority to act on behalf of the mortgage holder, RMAC Trust, Series 2013-1T. *See id.* ("If the Creditor participating in Loss Mitigation is not the direct holder of the loan, the Creditor is deemed to have full consent to act on behalf of the holder. If such consent has not been given, the Creditor must object to the Loss Mitigation Request and provide

---

[5] Throughout Mr. Bell's testimony, he never mentioned Ms. Horner. As for Mr. Aiken and Mr. Pound, Mr. Bell stated that Mr. Aiken "works in 'our' Litigation Department" and Mr. Pound "works in 'our' Loss Mitigation Department at Rushmore." To be clear, Mr. Bell does not work for Rushmore.

[6] A letter was filed by Creditor's counsel, who actively sought entry of the LM Order with regards to RMAC Trust, Series 2013-1T.

Page **10** of **17**

the name of the holder, trustee, or other entity that has the ability to participate in Loss Mitigation.").

Pursuant to the Procedures, any creditor participating in Loss Mitigation is required to identify in writing "the name, address and direct telephone number of the contact person who has full settlement authority." Procedures, at 5. Instead of designating one contact person with settlement authority, as it was required to do, Rushmore designated a contact without any settlement authority and provided a string of "contacts" to the Court—none of whom appeared to know anything about this specific loan or the exact reason for its denial.

The first person designated as Rushmore's contact person is Angeline Horner, an Asset Resolution Specialist at Rushmore. She was designated as the Loss Mitigation contact in the Creditor Affidavit, which was filed on August 12, 2014. Cred. Aff, at 2, ECF No. 27. Ms. Horner was also listed as the contact in an August 11, 2014 and a September 9, 2014 letter from Rushmore to the Debtor. *See* Trial Ex. D (letter dated Aug. 12, 2014) ("Should you have any questions regarding this matter, please contact your relationship manager Angeline Horner . . . ."); *see also* Ltr. dated Sept. 9, 2014, Trial Ex. F (same). Other than being named in these documents, it does not appear that Angeline Horner participated in the Loss Mitigation process on this loan. None of the letters from Rushmore are signed by her[7] and she did not appear in Court when the Court ordered a contact with authority to adjust the loan to appear.

In a letter dated October 7, 2014, Rushmore indicates that the Debtor's "Single Point of Contact" is Brian Pound. This is the second "single point of contact" named by Rushmore. Again, the letter is not signed by any individual and is closed simply "Sincerely, Loss Mitigation

---

[7] None of the letters from Rushmore are signed by an individual. The letters dated August 11, 2014 and September 9, 2014, close with "Sincerely, Home Retention Department Rushmore Loan Management Services LLC" with no signature or individual named. *See* Ltr. dated Aug. 11, 2014, Trial Ex D; Ltr. dated Sept. 9, 2014, Trial Ex. F. The Denial Letter, closes with "Sincerely, The Loss Mitigation Department." *See* Ltr. dated Oct. 7, 2014, Tr. Ex. G.

Page **11** of **17**

Department." *See* Ltr. dated Oct. 7, 2014, Trial Ex. G.  Mr. Bell testified that Brian Pound works in Rushmore's Loss Mitigation Department.  No explanation was provided by Rushmore or Mr. Bell as to how or why the "single point of contact" changed in the middle of loss mitigation and nothing was formally filed with the Court to amend the Creditor Affidavit, which names Angeline Horner as the designated contact for Rushmore.

When the Court ordered a representative of the Creditor with authority on the loan modification to appear at the January 21, 2015 hearing, a third person named Mike Aiken, appeared.  Mr. Aiken, who is a "Vice-President and Litigation Attorney for Rushmore," also filed a sworn affidavit on behalf of Rushmore.  Status Rpt., ECF No. 59, Ex. 2 (Aiken Aff ).  At the January 21, 2015 hearing, it became clear to the Court that Mr. Aiken did not have full authority to issue loan modifications on behalf of Rushmore.  Mr. Aiken indicated that he was beholden to the investor guideline, which he said "isn't necessarily a written document, more than it's a gentleman down the hall." Hr'g Tr. 5:2-3.

The "gentleman down the hall" to whom Mr. Aiken refers is quite possibly, William Bell. Mr. Bell appeared at the February 25, 2015 evidentiary hearing in response to this Court order that the investor and the person who made the denial on this particular Debtor's loan appear.  He testified that he has "final authority to make decisions on loan modifications" and that he can "overrule" the guidelines.  *Id.* at 14:21-25.  He claimed on several occasions that he, and only he, had full authority to grant and deny loan modifications.  *Id.* at  24:13-17.  ("I'm the only one that [sic] can actually deny [loan modification requests].  So I actually denied it.").  He also provided the Court with the name of fifth individual, Andrew Coup, who he said reviewed the file prior to sending it on to him.  *Id.* at 64:19-22.  Mr. Coup was never disclosed to the Court or the Debtor as a loss mitigation contact.

Page **12** of **17**

Despite Rushmore's sworn affirmation, which was filed on August 12, 2014, that Angeline Horner had full settlement authority to act on behalf of the RMAC Trust, it appears that she did not. *See* Procedures at 2 ("The term "Creditor" refers to any secured creditor whether it [is] the holder, mortgage servicer or trustee of an eligible Loan. If the Creditor participating in Loss Mitigation is not the direct holder of the loan, the Creditor is deemed to have full consent to act on behalf of the holder. If such consent has not been given, the Creditor must object to the Loss Mitigation Request and provide the name of the holder, trustee, or other entity that has the ability to participate in Loss Mitigation."). It is not even clear whether Ms. Horner reviewed the Debtor's file. By failing to provide the name of a contact with full settlement authority on Debtor's loan, Rushmore violated this Court's Loss Mitigation Procedures and is in contempt of this Court's LM Order. *See* Procedures at 5 ("Unless a Creditor has already done so as part of a Loss Mitigation Request, each Creditor shall provide written notice to the Debtor by filing and serving its Creditor Affidavit on the Debtor in which it identifies: 1) the name, address and direct telephone number of the contact person who has full settlement authority . . . ."); LM Order at 2 ("Each Loss Mitigation Party shall designate contact persons and disclose contact information, unless this information has been previously provided. As part of this obligation, the Creditor shall furnish each Loss Mitigation Party with written notice of the name, address and direct telephone number of the person who has full settlement authority on the loan in question . . . .").

***Debtor was Harmed by Rushmore's Failure to Designate Someone with Full Settlement Authority***

Having found that Rushmore failed to designate a contact with full settlement authority, the Court now turns to the question of whether Debtor was harmed by Rushmore's failure. The Court finds that she was. Debtor participated in this Court's Loss Mitigation Program for approximately four months before receiving notice that she was denied for failure to provide

proof of a down payment in an email from Creditor's counsel dated December 8, 2014 and repeated in a status letter filed with the Court on December 15, 2014.  *See* Trial Ex. G; *see also* Ltr., ECF No. 48.  Prior to that time, Rushmore never stated unequivocally that a down payment was required for the Debtor to be considered for a loan modification.

The Court's Loss Mitigation Program Procedures have been crafted specifically to prevent just these types of situations.  Pursuant to the Procedures, Rushmore was required to file a "Creditor Loss Mitigation Affidavit"[8] ("Creditor Affidavit") within 7 days of service of the LM Order.  Procedures at 5.  The Creditor Affidavit is a form created by the Court and requires a Creditor to swear to the documents that Debtor must provide in order to be considered for a loan modification.  The purpose of the Creditor Affidavit is to put the Debtor on notice of all of the information that is required in order to be considered for a loan modification with the Creditor at a very early stage in the loss mitigation process.  The first Creditor Affidavit filed by Rushmore on August 12, 2014, does not indicate that a down payment is required.  *See* Cred. Aff., ECF No. 27 ("At this time, no documents are being requested.  Documents were recently provided and are currently being reviewed by the Creditor.").

On September 2, 2014, a second Creditor Affidavit was filed.  This time the Creditor Affidavit requests "proof of down payment or letter of explanation as to why no down payment is available."  Cred. Aff., ECF No. 36.  On September 26, 2014, the Creditor filed a status report, as is required under the Procedures.  The status letter states: "[O]ur client has informed us that the debtor's loss mitigation was moving forward with no down payment offer as one has not been provided. The file is currently under review for a decision."  Ltr., ECF No. 40.

---

[8] The forms required to participate in the Court's Loss Mitigation Program are available at http://www.nysb.uscourts.gov/loss-mitigation.

On December 15, 2014, Creditor filed another status report, which states: "[O]ur client has informed us that the debtor's loan modification was denied as she could not provide a good faith down payment." Ltr., ECF No. 48. Attached to the status letter is a letter from Rushmore dated October 7, 2014, which states that the reason for denial of Debtor's loan modification request is that "[t]he amount of good faith down payment is insufficient to offer a loan modification." *See id.*

Thus, it seems that Rushmore did not provide the name of someone with full settlement authority until February 20, 2015, when Mr. Bell was named in the proposed joint pre-trial order. *See* Status Rpt., ECF No. 60, Ex. 1. Had Mr. Bell been involved in the process earlier, perhaps he could have made the Rushmore's requirements on this specific loan clear. By not informing the Debtor sooner, Debtor expended time in collecting documents and filling out paperwork. Debtor met with her attorney and her attorney appeared in Court, filed letters, and expended fees on her behalf. The fees will most likely be paid by the unsecured creditors through the plan. Thus, by failing to provide a contact with authority on the loan, Debtor was not fully aware of the requirements necessary to participate in loss mitigation and the Creditor has cost the Debtor as well as the unsecured creditors.

By failing to designate a contact with full settlement authority, Rushmore has failed to act in good faith under the Procedures and is subject to sanctions. Procedures at 5 ("The Loss Mitigation Parties shall negotiate in good faith. A party that fails to participate in Loss Mitigation in good faith may be subject to sanctions."); *see also In re Bambi*, 492 B.R. 183, 190-91 (Bankr. S.D.N.Y. 2013) (ordering a creditor to pay a debtor's attorney's fees for failing to participate in loss mitigation in good faith). Similarly, by failing to comply with the LM Order, which directed Rushmore to provide such a contact, Rushmore is in contempt of that order and subject to

Page **15** of **17**

sanctions. *Id.* ("Courts may also use civil contempt pursuant to § 105(a) and Federal Rule of Bankruptcy Procedure 9020 to 'to compel a reluctant party to do what a court requires of him.'") (quoting *Badgley v. Santacroce*, 800 F.2d 33, 36 (2d Cir. 1986).

For failing to participate in the Court's loss mitigation program in good faith, the Court awards the Debtor her actual damages incurred in participating in this loss mitigation process, including her travel to and from the Courthouse at $0.575 per mile,[9] expenses, and attorney's fees and costs.

### *Whether Rushmore Properly Designated its Attorney*

Rushmore was also required to designate "the attorney representing it in the Loss Mitigation." Procedures, at 5. Rushmore also designated Mark R. Knuckles, Esq. of Knuckles, Komosinki & Elliot, LLP ("Knuckles") as its attorney. Interestingly, Knuckles has never made an appearance in this case on behalf of Rushmore, the named creditor in the LM Order. Each document that Knuckles filed in this case states that it was filed "on behalf of U.S. Bank, National Association, not in its individual capacity, but solely as trustee for the RMAC Trust, Series 2013-1T." Creditor Aff., ECF No. 27. Some of the status reports filed by Knuckles on behalf of U.S. Bank contain letters from Rushmore. It is unclear to the Court what role,[10] if any, U.S. Bank had in this Loss Mitigation—aside from being "the trustee who handles the funds in the bank accounts." Trial Trans. 9:8-22. It is unclear whether Knuckles represents Rushmore in addition to U.S. Bank. Even at the trial where a representative of Rushmore was ordered to

---

[9] This rate is the same as the IRS's standard mileage rate taxpayers to use in computing the deductible costs of operating an automobile for business for 2015, available at http://www.irs.gov/Tax-Professionals/Standard-Mileage-Rates.

[10] Debtor's counsel insinuated that Rushmore is not licensed to service loans in New York. *See* Trial Tr. at 67:11-15. The Court has no evidence of this but does find it odd that Rushmore never appeared through legal counsel in this case.

appear, Mr. Kossar stated that he was appearing on behalf of U.S. Bank. *Id.* at 3:15-19.  No law firm made an appearance on behalf of Rushmore. *Id.*

While the Court finds the relationship between Knuckles and Rushmore concerning, it does not appear to have affected the loss mitigation enough to warrant sanctions beyond those already awarded.

## Conclusion

For the foregoing reasons, Rushmore has failed to participate in good faith the Court's Loss Mitigation Program and as a sanction shall pay Debtor's actual damages—putting her back to where she was before beginning loss mitigation.  Debtor should file an accounting of her actual damages, including expenses, travel time at $0.575 per mile, and attorney's fees.  The Debtor should submit an order consistent with this Memorandum Decision.

Dated: Poughkeepsie, New York
      April 20, 2015           /s/ Cecelia G. Morris
                                    CECELIA G. MORRIS
                                    CHIEF UNITED STATES BANKRUPTCY JUDGE

| Owner | RMC |
|---|---|
| Asset Manager | RMC |
| Investor # | 273 |
| Notes | 2nd & curr = Final Mod |
| Stip Period | 1st Liens<br>3 mos if <180 days dq<br>6 mos if => 180 days<br>2nd Liens<br>3 mos for 2nds |
| Target Down payment | 25% |
| Min LTV | 115% |
| Max FE DTI | 35% |
| Max BE DTI | 45% |
| Target NDI | 10-20% |
| Amortization | Fixed |
| Min Rate | 5-7% |
| MAX Term | 480 |
| Defer/Forgive | Defer |
| Waterfall Order | Capitalize<br>Rate<br>Defer<br>Term |
| Rush | Litigation |
| Hardest Hit Programs | Reinstatement - Yes<br>Unemployment - No, not as source of income for a mod |
| HAMP Participant | Only on those specifically noted w/HAMP icon |
| Value to be use for Hamp review | value in MSP |
| HAMP Special Instructions | HAMP PRA waterfall |


EXHIBIT A